# 10-3604

## United States Court of Appeals
### *for the*
## Second Circuit

---

ANTHONY ZENO,

*Plaintiff-appellee,*

vs.

PINE PLAINS CENTRAL SCHOOL DISTRICT,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

# BRIEF OF PLAINTIFF-APPELLEE

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
*Counsel for plaintiff-appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. The Zenos move to Pine Plains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2. Plaintiff's complaints to school authorities . . . . . . . . . . . . . . . . . . . 2

    3. Spring 2005 semester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        a. Michael O. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        b. The necklace incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        c. "Other things happened" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        d. Mrs. Zeno's May 13, 2005 letter . . . . . . . . . . . . . . . . . . . . . . . 8

    4. Fall 2005 semester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        a. Robert M. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        b. Kyle M. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        c. Mrs. Zeno's September 19, 2005 letter . . . . . . . . . . . . . . . . . . 10

        d. Bathroom death threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        e. Michael H. Sussman's email . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        f. Kaumeyer's meeting with human rights advocates . . . . . . . . . . . 13

        g. Shadowing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        h. Jeff M's CD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i.  The principal surveys plaintiff's classes . . . . . . . . . . . . . . . . . . . 17

5. Spring 2006 semester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   a. Corey C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   b. Howe's January 2006 memo to the Superintendent . . . . . . . . . . 20

   c. McGrath seminar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   d. February 2006 mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   e. Ray H. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   f. Locker vandalism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

   g. Kyle R. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

   h. Code Yellow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   i. June 2006 CSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

6. Fall 2006 semester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

   a. Mrs. Zeno's October 24, 2006 letter . . . . . . . . . . . . . . . . . . . . . 29

   b. Rev. Childs' diversity training . . . . . . . . . . . . . . . . . . . . . . . . . . 30

7. The 2007-08 school years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

   a. Football game threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   b. Drama Club . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   c. Bruce W. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   d. Harassment on the BOCES bus . . . . . . . . . . . . . . . . . . . . . . . . . 34

e. Neil S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

8. The District's response to the racial harassment . . . . . . . . . . . . . . . 36

9. The District's other programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

10. Anthony's academic performance . . . . . . . . . . . . . . . . . . . . . . . . . 38

11. Anthony's emotional reaction to the racial harassment . . . . . . . . . 40

12. The verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

POINT I:    THE SCHOOL DISTRICT WAS DELIBERATELY
            INDIFFERENT TO THE RACIALLY HOSTILE
            EDUCATIONAL ENVIRONMENT . . . . . . . . . . . . . . . . . . . . . . . . 43

A. Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B. Legal standards governing deliberate indifference . . . . . . . . . . . . . 44

C. Defendant was unprepared to handle the racial harassment . . . . . . 50

D. Defendant did not reassess its failed approach . . . . . . . . . . . . . . . . 51

E. Defendant rejected immediate and effective ways to protect
   Anthony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

F. Each of defendant's witnesses was deliberately indifferent to
   the racial harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

G. The district offers no compelling reason to vacate the verdict . . . . 63

POINT II: THE DAMAGES AWARD DOES NOT SHOCK THE
CONSCIENCE ........................................... 67

   A. Standard of review ....................................... 67

   B. The damages award does not "shock the conscience" ........... 68

CONCLUSION ................................................... 81

CERTIFICATION ................................................. 82

# TABLE OF AUTHORITIES

**Cases**

*Board of County Com'rs v. Brown*, 520 U.S. 397 (1997) . . . . . . . . . . . . . . . . . . 47

*Brady v. Wal-Mart Stores*, 531 F3d 127 (2d Cir. 2008) . . . . . . . . . . . . . . . . 79-80

*Broome v. Biondi*, 17 F. Supp. 2d 211 (E.D.N.Y. 1997) . . . . . . . . . . . . 68-69, 79

*Brown v. DOCS*, 583 F. Supp. 2d 404 (W.D.N.Y. 2008) . . . . . . . . . . . . . . . 66-67

*Bruneau v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749 (2d Cir. 1998) . . . . . 45, 57

*Bryant v. Indep. School Dist.*, 334 F.3d 928 (10th Cir. 2003) . . . . . . . . . . . . . . 76

*Callahan v. Gustine School Dist.*, 678 F. Supp. 2d 1008 (E.D. Cal. 2009) . . . . . 48

*Crandell v. College of Osteopathic Med.*, 87 F. Supp. 2d 304 (S.D.N.Y. 2000) . 65

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) . . . . . . . . . . . . 44, 50, 59

*DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 67, 78

*Doe A. v. Green*, 298 F. Supp. 2d 1025 (D. Nev. 2004) . . . . . . . . . . . . . . . . 53, 55

*Doe v. Bellefonte Area Sch. Dist.*, 106 Fed. Appx. 798 (3d Cir. 2004) . . . . . . . . 49

*Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226 (D. Conn. 2009) . . . . . . . . . 64

*Doe v. School Bd. of Broward County*, 604 F.3d 1248 (11th Cir. 2010) . . . . . . . 47

*Estate of Landers v. Leavitt*, 545 F.3d 98 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . 45

*Folkes v. N.Y. Coll. of Osteopathic*, 214 F. Supp. 2d 273 (E.D.N.Y. 2002) . 65, 66

*Frank G. v. Board of Educ.*, 459 F.3d 356 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 57

*Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134 (2d Cir. 1999) . . . . . . . . . . . . . 46

*Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274 (1998) . . . . . . . 29, 65, 66

*Gibbs v. United States*, 599 F.2d 36 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . 68

*Gronowski v. Spencer*, 424 F.3d 285 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . 43, 44

*Howard v. Feliciano*, 583 F. Supp. 2d 252 (D. P.R. 2008) . . . . . . . . . . . . . . . . . 77

*Hughes v. Patrolmen's Benevolent Ass'n.*, 850 F.2d 876 (2d Cir. 1988) . . . . . . . 78

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir. 2010) . . . . . . . . . . . . . . . . 66

*Martinez v. The Port Authority*, 445 F.3d 158 (2d Cir. 2006) . . . . . . . . . . . . . . . 68

*Miner v. City of Glens Falls*, 999 F.2d 655 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 69

*Monteiro v. Tempe Union School Dist.*,158 F.3d 1022 (9th Cir. 1998) . . . . . . . . 76

*New York City Transit Auth. v. SDHR*, 78 N.Y.2d 207 (1991) . . . . . . . . . . . . . . . 77

*North Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982) . . . . . . . . . . . . . . . . . . . . . . 45

*O'Rourke v. City of Providence*, 235 F.3d 713 (1st Cir. 2001) . . . . . . . . . . . . . . . 66

*Osorio v. Source Enterprises*, 2007 WL 683985 (S.D.N.Y. 2007) . . . . . . . . . . . 78

*Papelino v. Albany College of Pharmacy*, __ F.3d __, 2011 WL 199124 (2d Cir. Jan. 24, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009) . . . . . . . . . 46, 55

*Pucino v. Verizon*, 618 F.3d 112 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Ramirez v. New York City OTB*, 112 F.3d 38 (2d Cir. 1997) . . . . . . . . . . . . . . . . 78

*Rangolan v. County of Nassau*, 370 F.3d 239 (2d Cir. 2004) . . . . . . . . . . . . . . . 67

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . 66

*Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648 (5th Cir. 1997) . . . . . . . 45

*Saggio v. Sprady*, 475 F. Supp. 2d 203 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . 52

*Singleton v. City of New York*, 496 F. Supp. 2d 390 (S.D.N.Y. 2007) . . . . . . . . . 78

*Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387 (E.D.N.Y. 2005) . . . 48

*Theno v. Tonganoxie Sch. Dist.*, 377 F. Supp. 2d 952 (D. Kan. 2005) . . . . . . . . 56

*Town of Hempstead v. SDHR*, 233 A.D.2d 451 (2d Dept. 1996) . . . . . . . . . . . . . 79

*Vance v. Spencer County*, 231 F.3d 253 (6th Cir. 2000) . . . . . . . . . . . . . 47, 53, 54

*Walz v. Town of Smithtown*, 46 F.3d 162 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . 67

*Wheatley v. Ford*, 679 F.2d 1037 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Whitfield v. Notre Dame Middle School*, 2011 WL 94735 (3d Cir. 2011) . . . . . . 49

*Wills v. Brown Univ.*, 184 F.3d 20 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Zeno v. Pine Plains Cent. Sch. Dist.*, 2007 WL 1403935 (S.D.N.Y. 2009) . . . . . 48

## Other authorities

Revised Sexual Harassment Guidance, U.S. Dept. of Education, Office
of Civil Rights (Jan. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47, 53, 55, 58, 61

## PRELIMINARY STATEMENT

Anthony Zeno submits this brief in opposition to the appeal filed by Pine Plains Central School District. The District challenges the district court's post-verdict rulings that (a) denied defendant's Rule 50 motion for judgment as a matter of law and (b) remitted the jury award to $1,000,000 to compensate plaintiff for pervasive racial harassment to which school district officials were deliberately indifferent under Title VI.

As outlined below, ample evidence supports the jury's finding that defendant was deliberately indifferent to the racial educational environment. The damages award also does not shock the conscience. This Court should affirm the judgment in all respects.

## STATEMENT OF FACTS

### 1. The Zenos move to Pine Plains

In January 2005, the Zeno family moved from Long Island to Pine Plains, in Northern Dutchess County. The Zenos are a multi-racial family. (JA 342-43). Anthony is a Latino (JA 343, 417) who went to a racially diverse high school on Long Island (JA 418), where he was classified with learning disabilities, including ADHD. (JA 343-44). In early 2005, plaintiff enrolled at Stissing Mountain High School, where he was also classified as a special education student. (JA 347-48). When Anthony began attending high school in Pine Plains, fewer than five percent of the

students were racial minorities. (JA 723).

## 2. Plaintiff's complaints to school authorities

Defendant repeatedly argues that Anthony only reported certain incidents to school authorities, prompting them to take action against the offending students. While this argument predicates the District's claim that the harassment died down over time, it does not view the evidence in the light most favorable to plaintiff, who *repeatedly* told Principal John Howe and others about hallway slurs and other racial harassment.

In the hallway between classes, a group of students called Anthony a nigger "all the time." (JA 431-32). Plaintiff frequently met with Howe to discuss this harassment: "every time something will happen in school, I go to Mr. Howe's office." (JA 432). Anthony "always told Mr. Howe all the things I kept on hearing in the hallways[,] what people were saying about me." (JA 508). In particular, Anthony recalled "a lot of racial slurs being said to me in the hallway. People making fun of me constantly[.]" *Id. See also*, JA 459 (in reference to being called "the black kid," "it was just constant. It was a constant thing"). While defendant argues that "Principal Howe testified that there were far fewer incidents reported with Anthony during his final two school years" (Brief at 26-27), plaintiff testified that he told Howe about hallway harassment "whenever I got sent to the office. ... Whenever an

2

incident occurred or anything happened, I would go and make sure I would tell him the things that were going on." (JA 508). Anthony was in the principal's office "all the time." (JA 509). Howe testified that "Anthony and I visited informally many times." (JA 739-40).

During these office visits, plaintiff "would say, 'Mr. Howe, ... it's going on still. There [are] people saying stuff in the hallway, and they're instigating it and making it bigger from the comments that they made in the hallway to me or anybody else. It keeps going.'" (JA 510). While the District cites Howe's testimony that Anthony was unable to name the offenders (JA 913), Howe and Anthony acknowledged that he was a new student who could not identify all of his classmates. (JA 510, 945).

Although he complained to Howe about the racial harassment, plaintiff did not see follow-up progress. (JA 466). As he approached graduation, plaintiff complained to the Principal less frequently because "[n]othing was being done, and it's been already three years." (JA 466-67).

> Howe recalled that plaintiff told him about racist hallway comments:
> Q: Did Anthony ever generally tell you "I'm hearing the N word in the halls, but I don't know who the students are"?
>
> A: Anthony would generally tell me that comments would be made in the halls, yes. (JA 913).

3

During Anthony's 3.5 years at the high school, plaintiff's mother, Cathleen Zeno, met with Howe "anywhere[] from 30 to 50 [times]. Every time there was an incident, I was going up to the high school and meeting with Mr. Howe." (JA 363). She told Howe that "[i]t just felt like we were kind of like in this twilight zone; that we've reversed back to the 1950s. I couldn't understand how these students were getting away with these racial slurs, you know, 'oh, we got another black person here,' ... the word nigger just thrown out at every incident all the time." (JA 364). Howe's "ongoing mantra" was that he "would look into it and that he didn't know ... how to keep Anthony safe on a day-to-day basis. He couldn't focus on the long-term safety goals, but he could only think of the short term, and that he would try to take every incident as they came and deal with it as they came." (JA 364-65). *See also*, JA 402. Howe repeatedly told Mrs. Zeno that he did not know how to ensure Anthony's safety. (JA 365).

### 3. Spring 2005 semester

In addition to regular hallway harassment that persisted throughout Anthony's tenure at Stissing Mountain High School, the jury heard evidence about specific racial incidents.

4

a. *Michael O.*

Once Anthony began attending the school, classmates taunted him over his race, *i.e.*, "[t]here's a new black kid in school." (JA 425). This focus on Anthony's race "was weird. I felt it was like a different world, new territory." *Id.* In mid-February 2005, shortly after Anthony entered the school, Michael O. approached plaintiff in the gym, made racial comments and said, "We don't want your kind here." (JA 79-80). Michael O. ran after plaintiff, threatening "to rip my face off and ... kick my ass." (JA 426). Other students called Anthony a nigger and were "saying stuff like 'go back to where [you] came from.'" *Id.* Plaintiff was "really shocked, because I'm not used to this type of atmosphere." (JA 427).

Plaintiff next went to Principal John Howe's office, asking him, "is this how this is done over here?" Howe "looked at me and said he really didn't have nothing to say to me" but that "he'll look into it." *Id.*

Anthony's parents immediately spoke with Howe. (JA 348-49). Howe told Mrs. Zeno that he would talk to Michael O's mother but that "this is a small town and you don't want to start burning your bridges." (JA 349). When Mrs. Zeno asked what would happen next, Howe said, "'well, the apple doesn't fall far from the tree,' meaning that ... this parent is just as aggressive as this child." *Id.* A few days later, Mrs. Zeno called Superintendent Linda Kaumeyer, who had never previously fielded

a racial harassment complaint at the District. (JA 526). After advising that her son was called a racial slur, Kaumeyer told Mrs. Zeno, "you moved here, you're new, and this is small-town living, and that ... things are done a little differently here." (JA 350). *See also*, JA 408. Mrs. Zeno understood Kaumeyer to mean that "because [you] live in a small town, [you] have to get used to the way things are done here." (JA 388-89).

School administrators next circulated an email referencing Mrs. Zeno's meeting with "Jack Howe re: racial slurs/statements made to their son." (JA 1161). Kaumeyer asked Howe "to give me a full report on the incidents." *Id.* The Superintendent's handwritten notes quote Mrs. Zeno stating that one of Anthony's classmates said, "We don't want your kind around here." (JA 1162-63). While Kaumeyer was not sure if this was a racial comment (JA 523), Howe knew that Anthony deemed this a racial statement. (JA 728). Kaumeyer's handwritten notes show that she and Mrs. Zeno that day discussed "bias" and "racial" issues. (JA 1163). Howe did not discipline Michael O. with any suspension. Nor did Howe signal to the student body that Michael O's behavior was inappropriate. (JA 730). For her part, Kaumeyer did not offer to meet with Mrs. Zeno on that occasion. (JA 526). Kaumeyer never met with the Zenos to discuss the on-going racial harassment. (JA 527-28).

6

b. *The necklace incident*

A few days later, two students ripped a thick chain off plaintiff's neck. (JA 318; JA 428-29). One of the students, David L., received 5-days' out-of-school suspension ("OSS"). (JA 318). When Howe met with plaintiff and the offending students, "they said [in Howe's presence] that 'why should we get in trouble for some kid's fake rapper bling bling.'" (JA 429). *See also*, JA 477. While the District argues that Anthony testified that the "rapper bling bling" comment was not made in Howe's presence (Brief at 6), that was deposition testimony. (JA 478-79). The jury was entitled to credit Anthony's trial testimony that this comment was made in Howe's presence. (JA 429).

c. *"Other things happened"*

Defendant argues that plaintiff did not report anything to Howe from February 25, 2005 through September 12, 2005. (Brief at 12) (citing JA 480). However, plaintiff testified that he *continuously* complained to Howe about hallway harassment. (JA 508-09, 739-40, 811). Howe corroborated this testimony. (JA 913). The jury reasonably may have found that these ongoing complaints took place during that period. While plaintiff's testimony at JA 480 says he did not report any "incidents" during this time, he also testified that "other things happened." *Id.* So-called "incidents," like racial attacks, are not the same as routine hallway harassment,

and the context of plaintiff's testimony shows that "incidents" were single-student attacks. *Id.* *See also*, JA 487 (plaintiff distinguished "incidents" from "a lot of talking and I'm going to beat you up").

### d. *Mrs. Zeno's May 13, 2005 letter*

On May 13, 2005, Mrs. Zeno wrote to Kaumeyer and the School Board: "I am writing to you with deep anguish and grief. As you are aware since our last conversation since our children have begun school ... they've been victims of verbal racial attacks and physical abuse from some of the students." (JA 84-85). Mrs. Zeno was referencing the Michael O. assault and follow-up racial slurs in the hallways. (JA 352). The Superintendent did not speak to Mrs. Zeno about this letter. (JA 354, 539-40). Nor did anyone from the Board. (JA 354). Although Howe was normally made aware of letters referencing high school students, the Superintendent did not share this letter with him. (JA 737).

### 4. **Fall 2005 semester**

#### a. *Robert M.*

In September 2005, the school year began with two acts of violence. In the presence of teachers and staff, Robert M. ran after plaintiff with his arms swinging and said "he was going to kick my black ass." (JA 430, 1164). (Although defendant argues that plaintiff testified differently at deposition [Brief at 7], the jury was entitled

8

to credit plaintiff's trial testimony about Robert M.'s racial slur). Robert M. hit Anthony "in my head." (JA 431). Robert M. was given 5-days' OSS. (JA 1164). A few months later, an Order of Protection prohibited Robert M. from going near Anthony's school (except for incidental contact). (JA 1157).

Plaintiff met with Howe about this incident. He recalled, "I was really upset. And I was in his office like usual. I told him, I said 'why me,'" *i.e.*, "why were these things happening to me?" (JA 431). Howe neither called the police nor signaled to the student body that serious incidents like this were unacceptable. (JA 742-43, 745-46).

### b. *Kyle M.*

A day after Robert M. assaulted Anthony, Kyle M. threw a hard plastic/metal chair at him. (JA 433, 749-50). As other students dragged him away, Kyle M. said "you F'g nigger. Go back to where you came from." (JA 433). (While defendant notes that plaintiff testified at deposition that Kyle M. instead said, "go back to Brooklyn where you came from" [Brief at 9], the jury was entitled to credit Anthony's trial testimony). During Howe's investigation, Kyle M. said, "I hate him – I just snap!" (JA 91). He also told Howe, "I'm going to get him." *Id.* A few weeks later, an Order of Protection restricted Kyle M. from going near the "school of Anthony Zeno." (JA 97). Kyle M. was given 5-days' OSS. (JA 89). While

defendant argues that "[n]o report of any racial incident was made to Principal Howe" in connection with this incident (Brief at 9), Howe testified that he thought this might be a racial incident. (JA 752).

c. *Mrs. Zeno's September 19, 2005 letter*

Mrs. Zeno again wrote to the Superintendent and the Board on September 19, 2005. (JA 1165-66). Also referencing her daughter, she wrote, "I am sure you are aware of the current situation involving our children." "These verbal attacks included racial slurs and threats to their lives. The physical attacks became so violent that Police were called to the school by your High School office and a Detective from the Dutchess County Sheriff's Dept. is handling the case. An Order of Protection is also being set in place against one of the students that has attacked our son." *Id.* She added that urgent phone calls from the school about her childrens' safety "ha[ve] been a regular occurrence since the beginning of the school year" and that "[w]e go to work each day wondering if our children are safe, only to receive phone calls several times each week telling us we need to come to school to attend to a situation involving them, and that our children are NOT safe." Mrs. Zeno wrote that her children "are now afraid to go to school." *Id.* (emphasis in original).

While Kaumeyer responded to Mrs. Zeno in writing (JA 1167-68), she did not follow-up with a phone call or meeting. (JA 357, 547-48). Nor did Kaumeyer

10

ever meet with Anthony. (JA 357). Instead, the Superintendent forwarded Mrs. Zeno's letter to the School Board. (JA 550, 1169). Although she knew that Anthony was punched in the head and another student tried to throw a chair at him (JA 552), Kaumeyer characterized the problems in Mrs. Zeno's letter as "minor and have been handled correctly." (JA 1169).

Kaumeyer also sent the letter to Principal Howe for his response. (JA 543-44, 759). In advising the Superintendent on Mrs. Zeno's complaint about racially-motivated attacks, Howe wrote defensively that there was "absolutely no record or report of this!" (JA 94). In fact, Howe knew that Anthony had endured racial slurs and that Michael O. had punched him. (JA 761). Howe also knew that Michael O. told Anthony, "we don't want your kind here." *Id.* By now, Howe knew that things were not getting any better for Anthony. (JA 762). However, Howe could not recall speaking to Mrs. Zeno about the September 19, 2005 letter. (JA 762-63).

### d. *Bathroom death threat*

Howe's punishments did not stop the harassment by other students. (JA 767). In late October 2005, Anthony saw violent graffiti in the bathroom stall (JA 435-36): "Zeno must die" and "Zeno is dead." (JA 99). The harassment was now becoming more serious, and more ominous. (JA 436, 765). Anthony showed the graffiti to Howe, stating, "that's my proof right there, look." (JA 436). By this point,

11

Anthony had gone to the principal's office "so many times" that he did not think they believed his complaints. (JA 436-37). While graffiti like this was unprecedented at the high school (JA 765), Anthony had seen other offensive graffiti at school, *i.e.*, an "occasional swastika" and a racial epithet. (JA 437). No one figured out who wrote out the death threat (JA 766), which meant that school officials knew that the offender continued to walk the halls without punishment. Howe's handwritten notes with Mrs. Zeno that day state that Anthony frequently heard students threaten to "kick[]" his "ass." (JA 1230).

### e. *Michael H. Sussman's email*

The Zenos met with Michael H. Sussman, Esq., who sent an email to the school district's attorney on November 2, 2005. (JA 358-59). After noting that Anthony and his sister were assaulted at school and that "numerous racial epithets have been hurled at these young people," Sussman outlined a series of steps for the District to follow: "In my opinion, these things must happen promptly: a) assignment of a shadow to ensure Anthony and Jenise safety while at school ... c) immediate implementation of sensitivity programs in the combined [Middle School/High School] reflecting the district's actual commitment to zero tolerance of racism and bias." (JA 1170). When the Superintendent saw this email in November 2005 (JA 558), she was aware that Anthony's family had complained about racial threats, a

12

death threat and acts of violence and that they had contacted the Dutchess County Human Rights Commission and the local NAACP. (JA 570).

f. *Kaumeyer's meeting with human rights advocates*

Prior to November 2005, the District had not considered implementing racial sensitivity programs. (JA 767). That month, after receiving a letter from Marilyn Vetrano of the Dutchess County Human Rights Commission referencing "a complaint of alleged racism related incidents involving students" (JA 1232), Kaumeyer met with Vetrano and Elouise Maxey of the Northern Dutchess County NAACP. (JA 555-563, 1172). While defendant's brief glosses over this meeting, Vetrano and Maxey were eager to work with students and staff on diversity issues through small-group workshops, seminars and staff training. (JA 594). Without charge, these advocates could expeditiously organize comprehensive and regular diversity training sessions, including training in small groups and large assemblies. They emphasized that their racial diversity programs were effective at other school districts. (JA 689-90). Vetrano explained that they coordinate a "whole program." "Usually, the training that we do is part of an ongoing training. ... [A] lot of our training comes from our networking with other facilitators and other teachers who are willing to volunteer their time and to go to a school district and do these kinds of things." (JA 692).

13

Maxey and Vetrano told the Superintendent they could bring in diversity and sensitivity programs involving audio-visuals, handouts, "role-playing to address several situations" and mediation. (JA 712-14, 718). With coordination from Dutchess Human Rights and NAACP's educational and legal redress volunteers, these programs would have commenced in only a few weeks, and volunteers could have regularly performed necessary follow-up training. The training programs were flexible enough to address a district's particular needs. (JA 713-74).

Although the Superintendent recalled that District administrators wanted a local program (JA 594-95), they did not take Maxey and Vetrano up on their offer (JA 690), and Maxey never heard back from the District. (JA 716-17). The Superintendent could not explain why the District rejected Vetrano's free training offer, essentially blaming Principal Howe and his staff for this decision. (JA 612-13). Vetrano and Maxey suggested that Howe pursue certain programs to combat racial discrimination. (JA 697). Although he was "open to any program with merit" (JA 951), Howe did not utilize Vetrano or Maxey's programs. (JA 764).

g. *Shadowing*

At their meeting, Maxey also asked Kaumeyer to provide Anthony with a shadow. Drawing on her experience with this remedy (JA 712), Maxey testified that shadowing is a fast, effective and inexpensive way to stop hallway harassment and

14

violence. (JA 712). At Maxey's request, other local districts had assigned shadows to protect students, in the form of school monitors, a secretary or an NAACP volunteer, *i.e.*, the organization's educational chair. (JA 712). She testified:

> A shadow is like a guardian angel for a child. It's an individual that will go to all the classes with the child, sit in the classroom. ... [T]he shadow will escort the child or children through the hallways, to their lockers, to the bathroom. The shadow is there to give the child a sense of safety, to make the child feel more comfortable. The shadow can also diffuse confrontations if something should happen in the classroom or while the child is going from class to class. (JA 711).

In a follow-up letter, Kaumeyer suggested that Vetrano take up the "shadowing" proposal with the principal, the Dean of Students and Stoorvogel. (JA 1172). Although Howe preferred to have staff keep an eye on Anthony from a distance (JA 771), he acknowledged that a shadow can help the principal seek a more severe punishment, since the "tie-breaking" testimony of a staff member who hears a student's racial comment can make the difference at a disciplinary hearing in which the District attempts to impose a suspension beyond five days. (JA 772-73).

Howe agreed that punishing students sends a message to the student body that the misconduct would not be tolerated. (JA 784-85). He testified that 5-days' suspension "would be sort of the first level of a serious nature." However, "if we had really bad kids, depending on how that's defined, I would take it a step further, to the

15

Superintendent's hearing." (JA 784). However, in the context of plaintiff's harassment, the District did not impose any punishment beyond 5-days' OSS. The Principal recognized that students continued to engage in racist behavior despite these short suspensions. (JA 826).

Although plaintiff had already been subjected to several acts of violence, a death threat and a racial threat, Howe said that shadowing was not a priority at the District. (JA 775-76). When Mrs. Zeno asked Howe about shadowing, he did not know anything about it. He denied that the Zeno family sought that remedy even though he knew their attorney had made that request in writing. (JA 366, 774). Anthony was not assigned a shadow. (JA 568, 588, 715).

Instead of shadowing, Howe asked teachers and staff to keep an eye out for Anthony and intervene if they saw any conflicts. (JA 731). However, Howe conceded that, from a distance, monitors cannot always stop another student from assaulting Anthony. (JA 731-32). He also agreed that "it would be highly unlikely" that any students would physically attack Anthony if a shadow accompanied him through school. (JA 817). Although Howe recognized there were "serious incidents" involving Anthony, he suggested a shadow was unnecessary because other than Michael O's punch to the head, "I didn't feel he needed a bodyguard to stop a physical attack when there hadn't been reports of physical attacks." (JA 818). But

Howe agreed that plaintiff faced an unknown danger since the bathroom death threat went unpunished and "you don't know what's going to happen afterwards." *Id.*

### h. *Jeff M's CD*

The racial harassment continued. In December 2005, a football teammate, Jeff M., gave Anthony a homemade CD containing a racist rap that included "[t]he word nigger." (JA 437-38, 881). After listening to it at home, plaintiff was "shocked. ... And to pass a CD around like that ... just in blatant openness ... an open area and handing it to people, I was just – I was disturbed and, at the same time, shocked." (JA 438). Howe agreed that the CD was appalling, "but [he] didn't connect it to Anthony directly" even though he knew that Jeff. M. gave it to plaintiff. (JA 782-83, 785). Also, by now, Howe knew that classmates were targeting Anthony because of his race. (JA 783). Although Jeff M. was given three-days' OSS and two days in-school suspension ("ISS") (JA 278, 783), he remained on the football team. Anthony recalled that "[coach] Mr. Giorgio needed him. He was one of the star football players." (JA 439). *See also*, JA 490.

### i. *The principal surveys plaintiff's classes*

In November 2005, Mrs. Zeno again appeared before the School Board over "her concern for the physical safety and emotional well being of the students." (JA 1229). The Superintendent was present at the meeting. (JA 573).

17

Meanwhile, Howe spoke to plaintiff's teachers to gauge his relationship with classmates. (JA 217). Although defendant plays down this conversation (Brief at 14), Howe's meeting with Anthony's Art teacher, Ms. Jamieson, established that this class was among the epicenters of the racial harassment. Howe recalled that Ms. Jamieson said "there were racial comments in the class all the time ... The teacher said to me that Anthony's presence may add to what's going on in the class." (JA 781). Howe also testified that the teacher had "some management issues." (JA 780). Rather than proactively deal with the problem, Howe handled it passively, telling the teacher "that if it continues or if there's anything she needs to report, she should report to me or to Mrs. Cook, the Dean of Students at the time." (JA 881).

### 5. Spring 2006 semester

a. *Corey C.*

Mrs. Zeno attended another School Board meeting in 2006, when school safety was on the agenda. During the public comment portion of the meeting, Mrs. Zeno asked "a general question ... in regard to how can we improve the school safety policy, and Ms. Kaumeyer turned to me and said 'we're aware of your personal issues and we're aware of your concerns, Ms. Zeno, but this is not the time for it.'" (JA 367).

Although the principal had only a few months earlier told Ms. Jamieson to

18

control her students' racism in Art class (JA 881, 937), in January 2006, Jamieson and Dean of Students Jean Cook advised Howe in writing that Anthony's classmate, Corey C., "frequently" called plaintiff "homey," "gangster" and other "racial stereotypical remarks" like "your people," "the hood" and "you're so ghetto." Corey C. also complained that "white people have to take anything that is said to them." Dean Cook advised Howe that Anthony "did not like the comments and considered them 'racist.'" (JA 102, 104, 106). Corey C. also called Anthony a "nigger." Corey C. associated with the other students who regularly tormented plaintiff. (JA 441). Plaintiff recalled that Corey C. would "constantly just say something to me like 'what's up, homie' or 'what's up, nigger.'" This was "just like a daily routine with this kid." *Id.* While Howe was not convinced that Corey C. was making a racist comment in saying "what's up, gangster" and "hi, homie" to a black classmate (JA 787-88), the Principal had heard that Corey C. called Anthony a nigger. (JA 789). Corey C. received a 5-day suspension. (JA 102)

Corey C. became a repeat offender despite the suspension. When Corey C. returned to school, Anthony testified that "he continued calling me a nigger. And then he came after me. ...[H]e just started swinging at me" (JA 442) in anger over the suspension. (JA 491, 791). This earned Corey C. another 5-day suspension. (JA 791). Since many witnesses saw Corey C. attack Anthony, Howe agreed that a

19

Superintendent's hearing could have further punished this errant student. *Id.* No such hearing was held.

In the context of plaintiff's encounter with Corey C., in January 2006, one of Anthony's teachers, Ed Pasquarelli, advised Howe in writing that plaintiff "was distressed & upset and talking about his intolerance of racism and his being tired of it etc." (JA 793-94, 1175). Pasquarelli also wrote that he "physically restrained Anthony trying to verbally talk him down. He was saying 'I'm tired of this – I can't take any more of it, I have to stop this – This has been going on *forever*.'" (JA 1177) (emphasis supplied). Howe agreed that Anthony was reaching a breaking point and that Corey C. learned nothing from his classmates' 5-day suspensions. (JA 796).

b. *Howe's January 2006 memo to the Superintendent*

In January 2006, Howe wrote to the Superintendent with proposals to improve the climate and culture at the high school. (JA 108-09). Howe drafted this memo in part to address Anthony's pressing issues. (JA 799). However, while Howe's memo suggested hiring a diversity consultant, increasing student involvement in school activities and utilizing community resources, reflecting the District's continued lack of urgency, he emphasized that "no commitments have been made to any individuals or organizations." (JA 108-09). While Howe testified that his memo was preliminary because the programs cost the District money, unaware of Vetrano

20

and Maxey's offer to Kaumeyer, Howe testified that he would have welcomed a free and effective program. (JA 800).

### c. *McGrath seminar*

The District sponsored a "one-shot" anti-bullying seminar in February 2006. (JA 623). The Superintendent first contemplated hiring McGrath Systems in April 2005. (JA 82; JA 530, 626-27). Although the District sought a fall 2005 date, the program took place in February 2006, two full semesters after Anthony first experienced racial harassment (JA 536, 736), and 10 months after Kaumeyer first contemplated hiring McGrath. (JA 82). The McGrath program was delayed because the trainer was unavailable in fall 2005. Kaumeyer testified that the program could have proceeded as scheduled had she asked McGrath to send another trainer. She chose not to. (JA 607-08).

McGrath covered *sexual* but not *racial* harassment (JA 446), and the public seminar "only lightly touched upon" bullying. (JA 366). Kaumeyer acknowledged that the program only focused on sexual harassment and bullying, not racial harassment. (JA 532-33, 580-81). *See also*, JA 693-94, 716. The District's summary of the program for teachers who could not attend McGrath focused on sexual harassment. (JA 181-87; JA 583-84).

At trial, the District tried to show that McGrath did in fact cover racial

21

issues, but it could only point to brief legal boilerplate against racial discrimination buried in a 103-page document. (JA 113, 609-10, 901). Howe agreed that this language did not train participants in the use of stereotypes, racial code words and racial sensitivity. (JA 942-43).

The District chose from a variety of options in selecting a McGrath program. In addition to the bullying seminar, McGrath also offered "cultural & racial diversity" workshops and seminars "to create an environment in schools and the workplace that addresses multicultural/multiracial issues by learning to value differences, utilize constructive communication and create workable problem-solving processes." (JA 236). The District did *not* choose that program, which would have directly addressed racial harassment. (JA 533-34).[1]

While it knew that Anthony continued to suffer racial harassment, the District did not retain McGrath for any follow-up programs. (JA 536, 822). Howe could not recall seeing the parents of plaintiff's antagonists at the program. (JA 803). He did not formally follow-up with the students to see if the McGrath message had sunk in. (JA 804).

---

[1] While Kaumeyer acknowledged that the District passed over McGrath's racial diversity program, she defended that choice in explaining that the District hired Rev. James Childs's JaRa Consulting. (JA 533-34). However, as outlined below, that non-mandatory program did not begin until fall 2006, with hands-on training starting in 2007-08, long after Kaumeyer first learned about plaintiff's racial harassment in February 2005. *See,* Statement of Facts § 6(b), *ante.*

### d. *February 2006 mediation*

In February 2006, the school set up a mediation for Mrs. Zeno to meet with Anthony's antagonists and their parents. (JA 367-68, 895-96). Although the District notes that Mrs. Zeno did not attend this mediation, the jury could have credited her testimony that the District never gave her a time or date (JA 368-69, 400), and in any event, she feared for her safety because Howe had previously said that "the apple doesn't fall far from the tree," which meant she would share a room with a potentially explosive parent. (JA 368, 400). Mrs. Zeno also wanted a mediator trained in bias awareness, diversity and diffusing tension. (JA 368, 399). Howe could not recall if the mediator was trained in bias awareness. (JA 941).

### e. *Ray H.*

On February 3, 2006, another student who associated with the harassers, Ray H., confronted plaintiff in the hallway. Ray H. "exploded on" Anthony, threatened to "kick my ass" and called him an "asshole" who was "look[ing] for trouble." (JA 443-44). Howe intervened, taking Anthony into a nearby classroom. (JA 219, 444, 812). Although Ray H. shouted out profanities because Anthony had identified him as one of his antagonists, Howe did not think this obscene threat violated the Code of Conduct. (JA 887). At trial, Anthony testified that, in Howe's presence (JA 494), Ray H.'s girlfriend called plaintiff a "black rapper" and said, "he

thinks that we're racist, but we're not." (JA 445). The jury could have found that, by this point, the racist students were retaliating against plaintiff for his complaints.

A few days later, according to a contemporaneous write-up, Ray H. "came out of [an] assembly swearing – He was asked to stop and refused escalating to include racial slurs." (JA 238). The student referral quotes Ray H. exclaiming, "This is fucking bullshit!" and says that he "continued w/ f-this and f-that." He also said, "It is time this school got rid of some of the fucking niggers anyway." *Id.* Ray H. was only given 5-days' OSS. (JA 238, 240). Plaintiff testified that, around this time, Ray H. drew a large swastika in Art class as other students laughed. (JA 446). Ray H. displayed a large noose in his car in the school parking lot. (JA 448-49).

Howe agreed the school could have easily punished Ray H. beyond 5 days through a Superintendent's hearing. (JA 810-11). The principal emphasized that "[i]t's a difficult balance, as a high school principal, to hold students accountable for their abominable behavior, but also protect their right to get an education." (JA 810). However, the principal testified that Ray H. could have received at-home tutoring even with a 10-day suspension. (JA 808-10). Howe's testimony suggested the school was going easy on Ray H. because he was a troubled student "and we were working with getting him placed in night school." (JA 810).

24

f. *Locker vandalism*

On February 16, 2006, David L. and Mike M. unscrewed the bolts from plaintiff's locker, causing the large metal door to hit plaintiff in the head and carom across the hallway. (JA 818-19, 822). Someone placed garbage in the locker. (JA 449). After Mike M. offered an apology, his OSS was trimmed to three days. (JA 286, entry 4). Like Corey C., David L. was another repeat offender. Although David L. received 5-days' OSS for previously tearing jewelry from plaintiff's neck, this time he only received 3-days' suspension for the more serious locker incident, which, according to school records, "creat[ed] a safety hazard" and "contribut[ed] to the other student's feelings of being harassed." (JA 320). Howe acknowledged that punishing David L. for the necklace incident did not deter him from unscrewing the locker door. (JA 822). While the District argues that students start each year with a "clean slate" (Brief at 19-20), the principal conceded that David L.'s more lenient punishment for the locker incident was inconsistent with the school's progressive discipline policy. (JA 934-35).

g. *Kyle R.*

Meanwhile, in Ms. Jamieson's Art class (which Howe knew was a racially-hostile environment [*see*, § 4(j), *supra*]), another student, Kyle R., admittedly said, "We should take a rope and go to the nearest tree – we should start acting like they

used to in the south." (JA 191). Students "were talking about how [plaintiff] pretty much caused all these problems and that they should just take care of it like they do down south, and that's hanging black people from a tree." (JA 447). Kyle R. received only 5-days' OSS for this. (JA 191). Howe testified that Kyle R. "often inappropriately said things. And again, I don't diminish this or excuse this, but Kyle had other issues with behavior." (JA 825). While Howe admittedly could have punished Kyle R. beyond 5 days through a Superintendent's hearing, he made excuses for Kyle R., testifying that "this came from a class where management was an issue and a number of the students were saying inappropriate things to each other, this being an example of that." *Id.* He added, "not to diminish what he said. This was a difficult time in his life, and there were other things going on that I tried to balance with everything. But we could have chosen [a Superintendent's hearing], yes." (JA 826).

The jury could infer that the District disadvantaged plaintiff in giving his tormenters the benefit of the doubt. In addition to Howe's testimony about Kyle R.'s personal life, Howe refused to acknowledge the high school had any "bad kids." (JA 842 ["They're all good kids"]). While he testified that "Anthony had a series of incidents that were very unpleasant, unacceptable, not positive," Howe could not bring himself to admit that Anthony endured a racially hostile educational

environment. (JA 852).

h. *Code Yellow*

In March 2006, two individuals in a van menaced plaintiff at his house with a gun. (JA 451-52). Shortly thereafter, while at school, plaintiff saw the van approach the building, prompting school officials to lock down the building in a Code Yellow. (JA 452-53). This episode frightened plaintiff; he knew "they're not going to stop. They want me out of here." (JA 454). Howe knew that Anthony was the target. (JA 828-832).

When Howe called Mrs. Zeno about the Code Yellow, referencing their prior conversations, she told him, "See Mr. Howe, my son is not safe. You had to go into lock down." (JA 832-33). Although Howe testified that plaintiff had not been physically assaulted at school other than a grazing punch to the head (JA 833), the jury could have deemed that a disingenuous answer in light of the various threats from the day plaintiff first entered the school, including Kyle M's attempted assault in the lunchroom, the bathroom death threat and the unscrewed locker door that hit Anthony in the head.

i. *June 2006 CSE*

In June 2006, Mrs. Zeno attended a Committee on Special Education (CSE) meeting for Anthony, who as a classified student was entitled to annual reviews of

his educational progress. (JA 1179). Special Education Director Maryanne Stoorvogel – who doubled as the district's Title IX compliance officer (JA 636, 724) – testified that she was not aware of any racial harassment against Anthony. (JA 637-38). Nor was she aware that Anthony was the victim of bullying. (JA 638). Stoorvogel also testified that Mrs. Zeno never told her at Anthony's CSE meetings about racial harassment. (JA 639, 641). However, plaintiff's Individualized Education Program ("IEP"), prepared with Stoorvogel's supervision (JA 650-63), states that "Anthony has been struggling with acceptance in the school environment. There have been numerous incidents between Anthony and others with prejudicial and racial overtones." (JA 655, 1184).

At the CSE meeting, Mrs. Zeno said that "Anthony has had a very difficult time in the last couple of weeks. He is very disturbed over the GED. He feels school is a battleground and the atmosphere sends a hate message." (JA 655, 1186). When Mrs. Zeno complained that Anthony was sharing classes with his racial harassers, Stoorvogel said "she doesn't have a magic crystal ball and she can't predict what next year will bring." (JA 372-73). Stoorvogel denied that Anthony suffered school-related safety issues and "suggested that the new year be started with a new slate." (JA 1186).

In the context of Anthony's poor grades flowing from the racial

environment, Mrs. Zeno also said the District could not ensure Anthony's safety. (JA 1186). She said Anthony was losing confidence and requested his transfer to another district in Dutchess County. (JA 1185). Mrs. Zeno's request came in the context of her complaint that altercations "ha[ve] not been dealt with in the past" and that "[t]his has affected academics. She stated that she did not feel the school could handle Anthony's disability and felt a bigger school district would help." (JA 1186). Immediately after Mrs. Zeno said this, her advocate cited *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274 (1998), in discussing harassment against Anthony. (JA 1185-86). Stoorvogel said this precedent was irrelevant. (JA 657).

Mrs. Zeno also referenced Anthony's on-going pain and suffering at the meeting: "Anthony has been slowly going downhill which is very disturbing to see." In addition, "Anthony lacks confidence in himself and has psyched himself out to fail." (JA 1185).

### 6. Fall 2006 semester

#### a. *Mrs. Zeno's October 24, 2006 letter*

The racial harassment continued in fall 2006. While defendant argues that "trial evidence indicated that no race-based or other incidents occurred during fall 2006 at all" (Brief at 25), the District overlooks the ongoing hallway harassment. *See* § 2, *supra*. On October 24, 2006, Mrs. Zeno wrote to the Superintendent, "As you

29

know Anthony has encountered several violent incidents since his arrival to Pine Plains HS. Due to the intensity of the violence Anthony's academics have suffered. At the last CSE mtg on June 13, 2006, ... Mrs. Stoorvogel told me that there is no way to assure safety for Anthony in the school setting. I have heard this before from Principal Mr. Howe. I just don't understand how can a child expect to learn under these conditions." (JA 193). Although Mrs. Zeno wrote that she wanted to discuss "possible solutions," Kaumeyer did not call her back. (JA 585).

Howe saw this letter. (JA 834-35). Howe agreed the District can transfer a special education student if the school cannot satisfy his educational needs. (JA 836). No one raised with Howe the possibility of such a transfer. (JA 835).

### b. *Rev. Childs' diversity training*

In Spring 2005, Howe began thinking about hiring a diversity consultant. (JA 836). However, dragging his feet, Howe was still considering this idea in May 2006, more than a year after Anthony first reported racial harassment. (JA 297, 836-37). In a May 2006 memo to the Superintendent, again reflecting no sense of urgency, Howe emphasized that while he recently met with Rev. James Childs, he wanted to schedule training for the 2006-07 school year but that "no commitments for training have been made with any individuals or firm at this time. All discussions are of a fact-finding and preliminary nature." (JA 297, 837). Rev. Childs did not begin

his work until 1.5 years after classmates began harassing Anthony. (JA 839-40).

Even after the District hired Rev. Childs, diversity training proceeded at a snail's pace. Rev. Childs spent the first two semesters (fall 2006-spring 2007) completing preliminary work (JA 841-42, 949-51), including circulating and reviewing student surveys and speaking to students to discuss "What is it like to be a student at Stissing Mountain High School?" (JA 301). This was not formal training, Howe conceded, and there was no student training in spring 2007. (JA 950). *See also*, JA 303 (contract between JaRa Consulting and defendant noting that Rev. Childs would not begin preliminary work until October 16, 2006); JA 593 (Superintendent deemed it "a fair characterization of his approach" that Rev. Childs spent the 2006-07 school year on assessment and preparatory work); JA 841 (Howe recalled that Rev. Childs would first survey the students and then analyze the data before commencing feedback sessions with school leaders); JA 845-46 (Howe agreed that Rev. Childs' preliminary work in 2006-07 was not diversity "training").

It was not until the 2007-08 school year that Rev. Childs began hands-on training. *See*, JA 301 (outlining the tasks for 2007-08, including "sensitivity activities/training related to the issues and experiences of the students revealed in the focus groups and survey results"); JA 594 (Superintendent agreed that the actual diversity training took place in 2007-08); JA 844 (Howe agreed this training began

31

two years after Anthony enrolled at the high school).

The training did not involve all students but randomly chosen participants who could opt-out. (JA 846-48). Howe acknowledged that parents of the racist students were free to ignore the program. (JA 847-48). Howe did not know if any of plaintiff's antagonists participated in the training. (JA 848). Plaintiff did not see his antagonists at the seminar. (JA 454-55). After plaintiff attended this program, racial name-calling in the hallway continued. (JA 455).

### 7. The 2007-08 school years

By January 2007, "things were getting worse" for plaintiff. (JA 455-56). While the District argues that Anthony's IEP for 2007-08 says things were improving for Anthony as he approached his senior year (Brief at 27), that comment was in the context of plaintiff's counseling and his ability to "control his feelings at school." (JA 1240). The same IEP notes that Anthony was "struggling in all his academic classes" (JA 1236), and it quotes Mrs. Zeno telling the CSE that Anthony was diagnosed with post-traumatic stress and "will continue outside counseling." (JA 1240). In addition, "his grades continue to drop," affecting his "self concept" and he talked about "giving up." (JA 1236). It adds that "Anthony has been struggling with acceptance in the school environment" and "would benefit from counseling to help him address issues in school." (JA 1238).

32

### a. *Football game threat*

Later that year, a classmate, Ralph, threatened to rape Anthony's younger sister and "kick [his] black ass." (JA 456). Plaintiff punched Ralph in the face, one of the rare moments that he lost control at school. (JA 456-57). He explained, "It wasn't just me now. Now they're going after people in my family. And this is a woman. You don't hear people talk about – about women at all. And then, like usual, he threw in calling me black." (JA 457).

### b. *Drama Club*

Plaintiff belonged to the drama club. In February 2007, when the students were contemplating their roles for an upcoming performance, they said he could play the "black gangster." (JA 457-58). Although the District argues otherwise (Brief at 26), plaintiff testified that he told Howe about this. (JA 458). Recognizing that plaintiff was complaining about racial treatment "all the time," Howe said, "all right, I'll go – I'll go check it out." (JA 458).

### c. *Bruce W.*

At a high school football game in fall 2007 (JA 499), Bruce W. told plaintiff that his sister was a slut, "and then he called me a nigger and he was going to kick my ass." (JA 450). As always, plaintiff told Howe about this: "like routine, I always go to his office, and I just told him. And he just told me we're going to look at it. And

33

then I asked him, I said, 'why is this always happening to me? Like me all the time, and it didn't happen to nobody else.'" Howe replied that "he doesn't know why." (JA 450-51). Bruce W.'s 45-day suspension did not result from the racial harassment; the school punished Bruce W. because he choked another student at the game. (JA 909- 10; JA 197-209).

### d. *Harassment on the BOCES bus*

In early 2007, as plaintiff was bused to a different school for BOCES classes, some classmates ridiculed him over his race. (JA 458-59). The District argues that plaintiff only gave "vague testimony" about racial comments on the bus. (Brief at 26). In fact, Anthony testified:

Q: What happened?

A: The same group of kids was always – it was always growing, and they were on my bus, too. And I was sitting like between the middle and the back of the bus, and all these kids sat in the front of the bus. And there was – I guess I was brushing my hair, and he asked me "why do black people always brush their hair for." And they would usually say, "oh, the kid in the back of the bus, the black kid in the back of the bus." (JA 459).

The District argues that "there is no record evidence of any specific reports being made of comments being made on the BOCES bus in 2007." (Brief at 26). In fact, plaintiff testified that he complained to Howe about these comments, but the students remained on the bus. (JA 459-60). By this point, plaintiff understood that

34

whenever the school punished one student for racial behavior, another student would continue with the harassment. (JA 460). Accordingly, the racial harassment continued through plaintiff's final semester at the high school, spring 2008. This included harassment in the hallways up until plaintiff's graduation. (JA 408-09).

e. *Neil S.*

In January 2008, Neil S. made "racial slurs" on the BOCES bus. (JA 211). Neil S. was among "that whole gang of kids" who had targeted plaintiff "since I started school there." (JA 460-61). He hounded plaintiff about why black people comb their hair and would "say[] things like the black kid's going in the back of the bus ... if it wasn't that, it was just 'the nigger's here.'" (JA 461). A few other students on the bus also called plaintiff a nigger. (JA 461).

Making his comment three years after classmates started calling him racial epithets, Neil S. only received one-half day's ISS for calling plaintiff a nigger. (JA 211, 215, 851-52). Dean of Students Richard Starzyk, who had authority to punish Neil S. (JA 975-76), testified that Neil S. told him that Anthony had provoked the racial comment. (JA 980-81). Rather than seek out plaintiff's side of the story (JA 981, 992-93), Starzyk accepted the word of this racist student (JA 993) and, "respect[ing] the honesty on Neil's part," gave Neil S. a light punishment. (JA 984). Neil S. was on the BOCES bus the next day. (JA 500-01).

Mrs. Zeno spoke with Starzyk about Anthony's harassment. (JA 382, 983). In response to a question about whether she told him that Anthony was subjected to racial slurs in the hallways, Starzyk recalled that "Mrs. Zeno said that Anthony had been being bothered by individuals" but that "I need to know names." (JA 983, 991). Mrs. Zeno understandably replied that she did not know the students' names. (JA 983). Starzyk testified that Anthony and his mother had been complaining to him about hallway harassment during Anthony's junior and senior years. (JA 992).

### 8. The District's response to the racial harassment

While the District highlights the disciplinary action against offending students, the Superintendent acknowledged that discipline "is not an exclusive remedy" and that it will not by itself change student attitudes and beliefs. (JA 538). She also conceded that administrators should re-examine their strategies in solving problems that will not go away. *Id.*

When Kaumeyer became Superintendent in 2004, there was no violence-prevention training at the District. (JA 519). Although the Superintendent met approximately every two weeks with District officials to discuss important matters (JA 634-35), Stoorvogel – who attended the meetings – recalled that plaintiff's racial harassment was never on the agenda. (JA 635). While the Superintendent testified that she discussed an all-points bulletin for staff to look out for Anthony in the

hallways (JA 566), Stoorvogel (also the District's Title IX officer) was not aware of that directive and could not recall the Superintendent mentioning it at these meetings. (JA 641-42). Kaumeyer never placed the directive in writing. (JA 566-67). Kaumeyer could not recall speaking with Stoorvogel about Anthony's racial harassment. (JA 563).

The Superintendent testified that no one conducted a Title IX investigation into Anthony's racial harassment because "the claims were for racial harassment and bullying" and administrators thought that enforcing the Code of Conduct was a faster solution. (JA 600-01). However, Title IX officers like Stoorvogel are responsible for investigating racial *and* sexual harassment. (JA 636, 724). She was never asked to investigate any racial harassment against Anthony. (JA 636). While Stoorvogel spoke with Howe about Anthony, Howe did not tell her about plaintiff's racial harassment. (JA 638). Nor did Stoorvogel know about the Orders of Protection (JA 643-44), the bathroom death threat or the Code Yellow. (JA 644-45). Yet, it was Stoorvogel with whom the Assistant Superintendent recommended that the District's lawyer speak about the shadowing proposal. (JA 1171).

Plaintiff complained to Howe that he shared classes with some of his tormenters. (JA 463-64). However, "every time they try to do a schedule change, there was always one or two in the class." (JA 464). Students who improperly

37

remained in plaintiff's classes included Ray H. and Kyle M. (JA 463-64). Likewise, Kyle M. and plaintiff shared lunch period and English class even after the Order of Protection issued. (JA 465). When the school removed Kyle M. from plaintiff's class, plaintiff was assigned to classes with other harassers. (JA 488).

### 9. The District's other programs

The District points to programs other than McGrath and Rev. Childs' diversity training. The STOP organization was instituted at the high school, but it "fizzled out" for lack of funding (JA 381-82, 597-98) because "they either didn't have the funding or there wasn't enough students." (JA 462). To plaintiff's knowledge, the organization was not again active while he was a student. *Id.*

While defendant cites "Project Wisdom," plaintiff had never heard of it before trial (JA 462), and it did not start up until 2007-08, his senior year. (JA 622). The school's press release on Project Wisdom did not reference diversity issues. (JA 310-11, 952). Plaintiff also could not recall any pro-diversity announcements over the loudspeaker (JA 462-63) or "Surviving in Someone Else's Shoes Day." (JA 502). Nor did the school celebrate Black History Month. (JA 463).

### 10. Anthony's academic performance

The Superintendent agreed that a racial harassment victim could suffer academically. (JA 562). When plaintiff began attending Stissing Mountain, his

38

grades were "good," but they "sunk" in 2005-06 and were "awful" in 2006-07. (JA 382-83). His grades improved in 2007-08 once he began attending BOCES classes off-campus. (JA 383). However, by Anthony's senior year, the school was still unable to coordinate his classroom schedule to keep him from the harassers. (JA 463-65, 488). This distraction interfered with Anthony's education. (JA 374). Stoorvogel told Mrs. Zeno, "there are certain classes that cannot be changed, and only at those specific times are those classes given, and those were Anthony's special education classes." *Id.* This problem was never resolved; in twelfth grade, Anthony had no schedule "because they did not know what avenue that Anthony would take." (JA 374-75).

The family decided that, "instead of Anthony spending another two years more and living hell at this school district, that he would compromise and take an IEP diploma and go off to BOCES," where he would take classes for half a day. (JA 375). While the family "agreed" to the IEP diploma (JA 1197), Mrs. Zeno had no alternative in light of the hostile environment: "I couldn't allow Anthony to do another two years in that school and be subjected to that abuse. ... At this point, Anthony was at his lowest. He had no self-esteem, no self-image, no self confidence, because he was being torn apart by these tormentors in attacking his color ... the way he looked." (JA 410). She did not want Anthony at the high school, testifying that

"it was like living in hell for him." (JA 376).

The IEP diploma placed Anthony at a significant disadvantage. Mrs. Zeno explained that these diplomas are "more for kids that have more mental retardation" and that colleges "do not accept IEP diplomas." (JA 375-76). Stoorvogel testified that an IEP is not comparable to a high school diploma and that recipients can only attend certain community colleges if they take pre-college courses. (JA 660). State Education Department records confirm that "[w]hile earning an IEP diploma may be an important milestone for a student, it is a diploma that is often not accepted by employers, the military, institutions of higher education, business/trade schools or apprenticeship programs." (JA 1124)

### 11. Anthony's emotional reaction to the racial harassment

Mrs. Zeno recalled that plaintiff was "upbeat, outgoing, friendly, positive, funny" and "the comedian in the family" before he enrolled at Pine Plains. (JA 383). Afterwards,

> Anthony was no longer Anthony. Anthony was more introvert[ed], more to himself, more guarded; he was more suspicious of people, depressing. He was very depressing; not only that, but ended up, at one point, being explosive. ... [H]e just couldn't handle it anymore. He just couldn't understand how people could not like him for the color of his skin. ... [H]e had a complete meltdown. And he ended up actually grabbing one of our dining-room chairs and slamming it down because he just couldn't take it anymore. He just had a meltdown. He just was so upset and so frustrated and so angry. (JA 384).

During the meltdown, plaintiff said "he couldn't take it anymore. That these people calling him nigger, that he couldn't handle them, that ... 'niggers don't belong here in Pine Plains,' and that ... he's tired [of] being called black all the time." (JA 384). When Elouise Maxey met with Anthony in late 2005, she "saw a very terrified, pathetic and sad young boy." (JA 717-18).

Shortly after he began experiencing harassment, plaintiff began eating lunch by himself in the principal's office to avoid his antagonists. (JA 432, 434-35). For plaintiff this was a "weird, lonely" experience. (JA 435).

In December 2005, Mrs. Zeno told school officials at a parent/teacher intervention meeting that her son was "very depressed over circumstances that have occurred," was "having trouble academically," and was "isolated" and "beginning private therapy." (JA 1231).

As a result of his emotional distress, for the first time in his life (JA 385), plaintiff saw a mental health professional "for a while" (JA 469) and "on and off for a year." (JA 385). He saw a therapist three or four times in 2006-07, and her successor. (JA 503-04). The second therapist told plaintiff "I could be a danger to myself." (JA 469).

## 12. The verdict

After conscientiously reviewing the evidence (JA 1074), the jury returned

41

a verdict in plaintiff's favor and awarded him $1.25 million in compensatory damages. (JA 1078). Post trial, the district court denied defendant's Rule 50 motion, but it reduced the damages award to $1 million pursuant to Rule 59. (SPA 1-7). Plaintiff accepted the remittitur in lieu of a new trial. (JA 1351).

## SUMMARY OF ARGUMENT

The jury properly found that the district was deliberately indifferent to the racial harassment. While it had notice of pervasive racial hostility toward plaintiff, the District was slow to react and adopted an approach that was clearly unreasonable, failing to use immediate and effective programs in place of those that either focused on sexual harassment or took an unusually long period of time to get off the ground. While the District punished offending students, contrary to the prevailing standard, it never reevaluated its approach after it became clear that the widespread racial problem was not limited to a few offending students. As the jury credited plaintiff's version of events and was able to reject the testimony of defendant's witnesses as incredible, the District is not entitled to Rule 50 relief.

The damages award does not shock the conscience. Judge Davison properly set the damages at $1 million, reducing the jury's award by 20 percent. Anthony and his mother explained how 3.5 years of racial harassment had adversely affected his mental state and his grades and led to his receipt of an inadequate IEP diploma. An

independent witness and several school documents further confirm Anthony's emotional reaction to the harassment. While the District cites Title VII cases in attempting to further reduce the damages, case law confirms that this approach is inappropriate in light of the unique values promoted by Title VI.

## ARGUMENT

### POINT I

## THE SCHOOL DISTRICT WAS DELIBERATELY INDIFFERENT TO THE RACIALLY HOSTILE EDUCATIONAL ENVIRONMENT

### A. Standard of review

"In reviewing the sufficiency of the evidence in support of a jury's verdict, we examine the evidence in the light most favorable to the party in whose favor the jury decided, drawing all reasonable inferences in the winning party's favor. In so doing, we cannot weigh conflicting evidence, determine the credibility of witnesses, or substitute our judgment for that of the jury." *Gronowski v. Spencer*, 424 F.3d 285, 291-92 (2d Cir. 2005).

Moreover, "[w]hile we review the entire record, we cannot consider evidence favorable to appellant that the jury need not have believed. That is, we must disregard contradicted evidence and testimony from impeached and interested witnesses that supports appellants. We will overturn a verdict only if there is 'such a complete absence of evidence supporting the verdict that the jury's findings could

only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the [appellant] that reasonable and fair minded men could not arrive at a verdict against [the appellant].'" *Id.* "Because of the limits on our review of a trial court's factual determinations, parties asking this Court to upset a jury verdict bear a heavy burden to obtain such relief." *Id.*

### B. Legal standards governing deliberate indifference

"For an educational facility to be liable [under Title VI], the plaintiff must establish that a school official with 'authority to address the alleged discrimination and to institute corrective measures' had 'actual knowledge' of the discrimination and failed to adequately respond. A school fails to adequately respond if it provides no response or if it provides a response that 'amount[s] to deliberate indifference to discrimination.'" *Papelino v. Albany College of Pharmacy*, __ F.3d __, 2011 WL 199124, at 5 (2d Cir. Jan. 24, 2011). "Deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Put another way, school districts are liable "where their own deliberate indifference effectively 'cause[d] the discrimination.'" *Id.* at 642-43. "That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645. *See also, id.* (district is liable

44

if it "expose[s] its students to harassment").

Under Title VI, "a defendant must take 'appropriate remedial action' in response to a complaint of [racial] harassment to escape liability. Implicit in our understanding of 'appropriate' was the notion that the action must be prompt. ... A remedial action taken following a lengthy and unjustified delay ... cannot be deemed 'appropriate.'" *Bruneau v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998). *See also*, Revised Sexual Harassment Guidance, U.S. Dept. of Education, Office of Civil Rights (Jan. 2001), at 15 ("[o]nce a school has notice of possible [racial] harassment of students ... it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end the harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again") (hereinafter "DOE Title IX Guidelines").[2] These standards are consistent with the district court's jury

---

[2] *See*, www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

"In general, '[w]hen interpreting title IX we accord the OCR's interpretations appreciable deference.'" *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 658 (5th Cir. 1997). This Court should defer to these thorough and longstanding guidelines. *See also, North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 522 n.12 (1982) ("[i]n construing a statute, this Court normally accords great deference to the interpretation, particularly when it is longstanding, of the agency charged with the statute's administration"); *Estate of Landers v. Leavitt*, 545 F.3d 98, 105 (2d Cir. 2008) ("'we construe the statute in the first instance,' and where the text does not resolve the issue, we give 'effect to [the agency's] nonlegislative interpretation to the extent we find it persuasive'").

charge: "[d]eliberate indifference means that the defendant's response or lack of response to the alleged harassment was clearly unreasonable in light of the known circumstances. Deliberate indifference may be found where a defendant takes remedial action only after a lengthy and unjustifiable delay or where defendant's response was so inadequate or ineffective that discriminatory intent may be inferred." (JA 1065).[3]

While defendant relies on First Circuit cases in arguing that it does not have to completely eliminate the harassment (Brief at 42), courts (including the First Circuit) have required school districts to reassess their inadequate remedial strategies in the face of persistent racial or sexual harassment. *See, Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999) ("if [an institution] learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability"); *Patterson v. Hudson Area Schools*, 551 F.3d 438, 448 (6th Cir. 2009) ("We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response, though effective against an individual harasser, are

---

[3] Defendant argues that "deliberate indifference" requires proof that "the defendant intended the discrimination to occur." (Brief at 38) (citing *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999)). This *dicta* in *Gant* does not govern this case for several reasons. First, the district court's jury charge – to which defendant consented – omits any "intentional" test. (JA 1065). Second, *Gant* explained that language as requiring proof that "the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" *Id.* at 141.

46

ineffective against persistent harassment against a single student"); *Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) ("[W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior"); *Doe v. School Bd. of Broward County*, 604 F.3d 1248, 1261 (11th Cir. 2010) ("[a]lthough we have recognized that a school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing the plaintiffs, we agree with the Sixth Circuit that 'where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior'").

The standard adopted by the First, Sixth and Eleventh Circuits is consistent with Guidelines issued by the U.S. Office of Civil Rights stating that districts should reevaluate any failed preventative strategies to end student-on-student harassment. "Schools do not have to know beforehand that their response will be effective. However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps." (DOE Title IX Guidelines, at vi). A similar test governs constitutional deliberate indifference cases. *See, Board of County Com'rs v. Brown*, 520 U.S. 397, 407 (1997) ("[i]f a program does not

47

prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability").

Accordingly, as the district court noted on the summary judgment motion, "plaintiff has alleged not only discrete incidents of racial harassment, but a pervasive atmosphere of racism that hindered his access to education. ... In light of repeated incidents documented by Defendant, a question of fact remains as to the reasonableness of its comprehensive response to Plaintiff's situation." *Zeno v. Pine Plains Cent. Sch. Dist.*, 2007 WL 1403935, at * 3 (S.D.N.Y. May 20, 2009). The jury was free to find that the District was deliberately indifferent to the known racially-hostile educational environment, and that its response to the pervasive hostile environment was neither prompt nor effective under the circumstances. Cases like this are appropriate for the jury. *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) ("'Deliberate indifference will often be a fact-laden question,' for which bright lines are ill-suited"); *Callahan v. Gustine School Dist.*, 678 F. Supp. 2d 1008, 1038 (E.D. Cal. 2009) ("whether an institution acted with deliberate indifference under a particular set of circumstances is a question normally

left to the jury").

In contrast to the above authorities and the jury instructions focusing on the District's "lengthy and unjustifiable delay" (JA 1065), defendant relies on unpublished Third Circuit summary orders. In *Whitfield v. Notre Dame Middle School*, 2011 WL 94735 (3d Cir. Jan. 12, 2011), the Court held that the plaintiff did not prove a hostile environment, rendering as *dicta* its brief analysis on deliberate indifference. While the Court in *Whitfield* noted that the school "implemented a racial sensitivity program," it provides no details about whether, unlike here, that program was timely implemented. In *Doe v. Bellefonte Area Sch. Dist.*, 106 Fed. Appx. 798 (3d Cir. 2004), the district's response to the sexual harassment was more comprehensive than the instant case, as it circulated memoranda to faculty and staff about the harassment, provided the victim with a "special means of reporting any additional harassment" and "held assemblies and encouraged policies addressing peer-to-peer harassment." *Id.* at 800. While amicus counsel warns that Judge Davison's standard imposes an insurmountable burden "notwithstanding a school district's best efforts to address student-on-student discrimination" (Amicus br. at 14), that brief does not analyze the trial evidence and, as outlined below, the jury was entitled to find that the District officials did not use their best efforts in stopping the harassment.

49

## C. Defendant was unprepared to handle the racial harassment

The racial harassment caught the District flat-footed. The District had never experienced this kind of discrimination (JA 526, 723-24), and the high school had few racial minorities. (JA 419, 517, 723). The Principal and Superintendent brushed off Mrs. Zeno's initial complaints about the racial harassment, advising that she was now living in a small community and "things are done a little differently here." (JA 350). *See also*, JA 349. Viewing the facts most favorably to plaintiff, these comments about the realities of small-town living suggested that District officials believed the Zenos would simply have to get used to Anthony's new environment. Although Mrs. Zeno began sending the Superintendent letters about the harassment, the Superintendent did not meet with her to discuss the problem. (JA 354, 539-40). The jury could have found that these initial missteps set the tone for the rest of Anthony's high school career in that the harassment was not nipped in the bud and administrators engaged in a pattern of downplaying the seriousness of the problem or ignoring the family outright. (JA 1087-88, 1099 ¶¶ 15, 17-19, 40; JA 354, 539-40, 737; JA 1169 [characterizing Anthony's problems as "minor"]). As the District has "comprehensive authority ... to prescribe and control conduct in the schools," *Davis*, 526 U.S. at 646, its failure to deal with the problem right away foreseeably "'cause[d] [plaintiff] to undergo' harassment or 'ma[d]e [him] liable or vulnerable to it.'" *Id.* at

645.

**D. Defendant did not reassess its failed approach**

While District officials told Mrs. Zeno they could not ensure Anthony's

safety (JA 193), the jury was able to find otherwise. The best way to cut out the racial

hostility and protect Anthony from physical threats was a shadow, proposed by

plaintiff's attorney in November 2005. Elouise Maxey of the local NAACP testified

that shadowing was a workable solution in other local school districts (JA 711-12),

and even Howe agreed that "it would be highly unlikely" that any students would

physically attack Anthony if a shadow accompanied him through school. (JA 817).

While the District suggests shadowing was unnecessary because Kaumeyer

purportedly issued an all-points bulletin for staff to look out for Anthony (Brief at

46), the jury could find this bulletin was never issued. (JA 641-42). Contrary to the

District's arguments (Brief at 46), preventing hallway attacks was not the only reason

to implement shadowing. Howe also agreed that a shadow could double as a tie-

breaking witness in any harassment dispute, allowing him to impose greater penalties

through a Superintendent's hearing beyond the usual 5 days' OSS. (JA 771-73). The

jury could have found that it was also less likely that students would make racial slurs

in the presence of a shadow. This proactive remedy would have sent a firm message

that the school took its anti-harassment policy seriously and satisfied the District's

obligation to strengthen its ineffective penalties for racial bullying.[4]  As Howe knew

that the 5-day OSS was not deterring other students, the failure to implement

shadowing constituted deliberate indifference.  (JA 826).

Although shadowing was inexpensive and workable, Howe testified that it

was not a priority (JA 774-75) and the District never revised its strategy to clean up

the school environment, hoping that punishing enough students would make the

problem go away.  But, like stomping on a few cockroaches without killing off the

nest, the harassment continued as other students from the same nefarious crowd

furthered the abuse.  Although the Superintendent acknowledged that schools should

re-examine ineffective strategies and that discipline "is not an exclusive remedy" (JA

538), the traditional methods of stopping student misconduct were obviously not

working; the jury could have reasonably found that, in light of the intractable

---

[4] The District argues that shadowing is not "constitutionally required."
(Brief at 44-45) (citing *Saggio v. Sprady*, 475 F. Supp. 2d 203, 211 (E.D.N.Y.
2007)).  This argument must fail.  First, this is a Title VI case, not a Fourteenth
Amendment case.  Second, NAACP was able to offer one of its volunteers to
shadow Anthony, costing the District nothing.  (JA 713-14).  Third, the reasoning
in *Saggio* is not persuasive.  No particular response to student harassment – be it
diversity programs or particular punishments – is "constitutionally required."  The
issue is whether the District was deliberately indifferent through its failure to
implement effective programs.  "What constitutes a reasonable response to
information about possible [racial] harassment will differ depending on the
circumstances."  (DOE Title IX Guidelines, at 15).  The jury could have found that
shadowing was the perfect solution to stop the verbal and physical racial
harassment.

52

problem, the District had no choice but to impose stiffer penalties through Superintendent's hearings to further drive home the message that racial harassment was intolerable. As outlined above, "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior." *Vance*, 231 F.3d at 261. While the District argues that it took appropriate action against Anthony's antagonists by imposing five-day suspensions, it had a duty to increase the punishments in order to preserve Anthony's right to an appropriate educational environment, and it could have easily done so. *See, id.* at 62 (upholding judgment for student where defendant "continued to use the same ineffective methods to no acknowledged avail. Although 'talking to the offenders' produced no results, Spencer continued to employ this ineffective method"); DOE Title IX Guidelines, at 16 ("Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both. A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment").

It is not enough for the District to say that it did *something* in response to the harassment. *See, Doe A. v. Green*, 298 F. Supp. 2d 1025, 1036 n. 4 (D. Nev.

53

2004) ("in some jurisdictions, a school district will not be considered deliberately indifferent so long as it has responded in some way to a complaint. Such a standard, however, has been rejected in other circuits") (citing *Vance*, 231 F.3d at 261) (rejecting school district's contention that as long as it had done "something" in response to the harassment of a student, it had satisfied the standard). While the District did mete out punishment to individual students (Brief at 42-43), this response obscured a larger problem as many other undeterred students regularly tormented plaintiff, using racial epithets in the hallway. While the District argues that the racial harassment died down in Anthony's final two years of high school (Brief at 43-44), the jury was entitled to credit plaintiff's testimony that he routinely told the principal about this hallway harassment over the course of 3.5 years. *See*, Statement of Facts, § 2. The District also ignores evidence that Mrs. Zeno routinely told Dean Starzyk about the harassment during Anthony's junior and senior years. (JA 382, 983, 991-92). The racial problem did not go away, and the District knew it. Rather than take a proactive approach to provide Anthony a safe and non-discriminatory educational environment, the District took a legalistic and reactive approach, opting to punish offenders on a student-by-student basis and dragging its feet on diversity training and other remedies. Stamping out one pest will not solve the infestation if a systematic approach is avoided. The jury was entitled to find that it was clearly unreasonable for

the District to ignore the comprehensive approach offered by Vetrano and Maxey and the DOE Title IX Guidelines at p. 16.

While some non-comprehensive programs went into effect late in Anthony's tenure at the high school (JA 1116 ¶ 85), as the Superintendent recognized that changing attitudes and beliefs is a long-term and gradual commitment (JA 622-23), these programs were too late for Anthony and could only help the next generation of students. Defendant's minimalist response is not enough to disturb the verdict reached after lengthy deliberations. *See, Doe A. v. Green*, 298 F. Supp. 2d at 1036.

Courts have already rejected defendant's argument. In *Patterson*, the Sixth Circuit noted that "[t]he thrust of Hudson's argument is that Hudson dealt successfully with each identified perpetrator; therefore, it asserts that it cannot be liable under Title IX as a matter of law. This argument misses the point. ... Hudson's success with individual students did not prevent the overall and continuing harassment of D.P., a fact of which Hudson was fully aware, and thus Hudson's isolated success with individual perpetrators cannot shield Hudson from liability as a matter of law. It is for a jury to decide whether Hudson's actions were 'clearly unreasonable.'" 551 F.3d at 449-450 (citing *Theno v. Tonganoxie Sch. Dist.*, 377 F. Supp. 2d 952 (D. Kan. 2005), which held that a jury could find a school district liable for pervasive harassment where reprimands did not prevent *other* students from tormenting plaintiff

and the district delayed in implementing diversity programs, reasoning that "this is not a case that involved a few discrete incidents of harassment").

**E. Defendant rejected immediate and effective ways to protect Anthony**

The school's mechanical approach to student punishment and its failure to implement shadowing were not the only reasons to impose liability. In fall 2005, the District ignored the free, immediate and effective services offered by two local human rights advocates willing to work with the school on a regular basis to educate and train students and staff on diversity issues. (JA 1090-91 ¶¶ 22-24). While Elouise Maxey and Marilyn Vetrano were qualified to provide this training, the District consciously rejected their offer (JA 1091-92 ¶¶ 25-26), instead pursuing programs that either did not address racial harassment or commenced after unreasonable delay. Although it knew the racial harassment was widespread, defendant opted for the McGrath bullying program (one year after the racial harassment started) that only focused on *sexual* harassment, actually bypassing McGrath's racial diversity training. (JA 1098-1100 ¶¶ 39-43). This choice ran afoul of the DOE's Title IX Guidelines, at 17 ("depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and how to respond"). After significant delay in pursuing such a program,

the District also put on Rev. Childs' non-mandatory diversity program that did not begin hands-on training of the student body until spring 2007, *two years* after Anthony first entered the school and reported to authorities that hostile classmates were subjecting him to racial harassment. (JA 1107-08 ¶¶ 62-65). This was not "prompt" or "immediate" remedial action. *Bruneau*, 163 F.3d at 761; Title IX Guidelines, at 15. In light of Maxey and Vetrano's offer to implement immediate and effective diversity programs without charge, the District's "lengthy and unjustified delay" in implementing diversity training is precisely the "clearly unreasonable" response to racial harassment that violates Title VI. *Bruneau*, 163 F.3d at 761.

The District also rejected other feasible remedies. At her son's CSE meeting, Mrs. Zeno suggested the District transfer Anthony to another school district. As school districts often pay for disabled students to attend more appropriate schools, *see*, *Frank G. v. Board of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006), this suggestion was feasible, as the Principal conceded. (JA 836). However, brushing aside the toxic racial environment, the Special Education Director suggested that plaintiff instead start "the new year with a new slate" or a new start. (JA 1186). Changing schools would have been especially appropriate since the jury could find that the District knew the harassment was hurting plaintiff's grades and he might not earn enough credits to graduate. The school also knew the educational environment was unsafe

as it went into lock-down when a menacing van approached school property after these individuals had previously threatened Anthony with a gun. (JA 451-54, 827-32).

The District could have expeditiously assembled the student body and/or their parents for a serious discussion on racial harassment and sent home letters that emphasized the District's strict anti-discrimination policy. These letters could have warned parents that serious consequences awaited any student who violated the policy. *See*, DOE Title IX Guidelines, at 16 ("If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct"). The closest the District came to an organized gathering was the McGrath bullying seminar that did not cover racial harassment, and Rev. Childs' diversity program that did not start hands-on training until Anthony's senior year.

In failing to properly deal with the harassment and signaling to the student body that the District would not more aggressively punish the offending students, defendant effectively caused further harassment to occur. "At a minimum, [it] cause[d] [plaintiff] to undergo harassment or ma[d]e [him] liable or vulnerable to it."

*Davis*, 526 U.S. at 642-43. And it did, for more than three years.

### F. Each of defendant's witnesses was deliberately indifferent to racial harassment

The District's deliberate indifference was pervasive. Each District official who testified at trial failed Anthony. The Superintendent was disingenuous in testifying that she issued an all-points bulletin to look out for Anthony inside the building. Although this would have been an important matter for the Superintendent's cabinet meetings, the jury could have found that this topic was never discussed (JA 641-42), and that Kaumeyer never issued this directive. In any event, this remedy was reactive in that, unlike a shadow escort, staff and teachers informally watching out for Anthony can neither hear everything said to him nor intervene quickly enough to protect him physically.

In failing to call or meet with Mrs. Zeno to discuss the problem, the Superintendent consciously avoided proactive communication and passed the buck to the Principal. Kaumeyer could have met with the Zeno family to fully understand Anthony's educational environment and used the weight of her authority to stop this problem before it spread any further. She did not do so. That dereliction set the tone for the duration of Anthony's high school experience. The only way to deal with the serious problem of pervasive racial harassment is to take it seriously *immediately*. Instead, when Mrs. Zeno in May 2006 wanted the school board to take up her son's

harassment, Kaumeyer shut her down. (JA 367). As Howe was not aware that the local human rights agencies were able to train students and staff without charge, the jury could have inferred that Kaumeyer also kept the principal in the dark about effective programs that could have ended the harassment. (JA 800). As Superintendent of a small school district, was it too much to ask that she make this a priority?

Principal Howe's deliberate indifference partly stemmed from the Superintendent's determination to pass the buck. This task overwhelmed Howe. While he recognized by January 2006 that the school had an "urgent" problem (JA 799), Howe treated the racial harassment like a traditional discipline problem, *i.e.*, meting out punishment as if the misconduct carried no common denominator. Howe was admittedly reactive in approaching the harassment problem, telling Mrs. Zeno that "[h]e couldn't focus on the long-term safety goals, but he could only think of the short-term, and that he would try to take every incident as they came and deal with it as they came." (JA 364). Howe was also disingenuous about the state of Anthony's educational environment. In response to the Superintendent's inquiry in September 2005, the Principal falsely denied there was any racial harassment. (JA 1088 ¶ 18). Although several dozen documents in evidence make reference to racism at the high school, Howe inexplicably was not convinced that Anthony's harassment

was racially-motivated. (JA 852). If he did not comprehend the problem, how could he find a solution? This state of denial represents deliberate indifference under Title VI. Yet, when Howe spoke to Anthony's teachers in November 2005, he discovered that racial comments infected plaintiff's Art class and that Anthony's presence only made it worse. (JA 217). Although he learned about the Art class racism only a few days after Maxey and Vetrano met with school officials, Howe did not ask these advocates to help deal with this problem head-on, opting instead to leave Anthony in a toxic classroom with a teacher whom Howe conceded had "management issues." (JA 1096 ¶ 34; JA 780-81, 881; JA 217). Howe reacted passively to the news that Ms. Jamieson's Art class was a sea of racial hostility. (JA 881). Howe was required to tackle this problem aggressively. He did not. *Compare*, DOE Title IX Guidelines, at 16 ("if a female student has been subjected to harassment by a group of other students in a class the school may need to deliver special training or other interventions for that class to repair the educational environment"). Shortly after Howe made this decision, in a plea for help, Anthony openly proclaimed at school that he could not take it anymore. (JA 1177). Confirming that Howe was in over his head in dealing with this unprecedented and admittedly urgent problem, his written proposals were tentative and reflected no sense of urgency. (JA 799-800; JA 108-09). Howe knew the Rev. Childs diversity training took forever to get off the ground (JA

61

1107-08 ¶¶ 62-64), and he made excuses for the offending students, reluctant to punish them more severely to avoid interfering with their education (even though they were entitled to home-tutoring while suspended) and testifying that all the students were "good kids." (JA 1101-03 ¶¶ 48, 50-51). In protecting the harassers, Howe exposed Anthony to more racial abuse.

Meanwhile, Title IX officer and Special Education director Stoorvogel was asleep at the wheel in never investigating known harassment against Anthony, despite her mandate to do so (JA 1114-15 ¶ 82) and her own IEP's explicit reference to plaintiff's intolerable racial environment. (JA 1184, 1186). Before she was presented with this document at trial, Stoorvogel testified that she was not aware of any racial harassment problem at the high school. The jury could have deemed Stoorvogel's testimony incredible. Moreover, while shadowing was an excellent way to protect Anthony, it was Stoorvogel (of all people) who was assigned to speak with the District's lawyer about this remedy. (JA 1171). Stoorvogel was unfamiliar with the extent of Anthony's harassment (JA 1114-15 ¶¶ 82-83) even though proof was right under her nose as Special Education director. (JA 1104-05 ¶¶ 55-56; JA 1184 [IEP referencing "numerous incidents between Anthony and others with prejudicial or racial overtones"]). Stoorvogel was also unfamiliar with legal precedent governing student harassment. (JA 657, 1186).

Dean Starzyk's testimony confirmed that the deliberate indifference continued unabated through spring 2008, shortly before Anthony graduated. After three years of continuous harassment, Mrs. Zeno continued to complain about racial slurs. (JA 991-92). Starzyk said he could not respond to these complaints without the names of the student-offenders. *Id.* But any naming requirement was unrealistic since Anthony did not know all of his schoolmates. (JA 510). In any event, one offending student was given a surprisingly light penalty. While Neil S., a student on the BOCES bus, called Anthony a nigger and uttered other racial slurs, he was only given a half-day in-school suspension after Starzyk took the racist student at his word in finding that Anthony had actually provoked this verbal attack. After three years, the District had learned nothing in failing to properly investigate the latest in an endless series of racial incidents. Neil S. got off nearly scot-free. (JA 1110-11 ¶ 72).

### G. The District offers no compelling reason to vacate the verdict

As argued above, defendant points to measures that were either too little, too late or were plainly unreasonable in light of the malevolent cloud over the high school to which District officials knew Anthony was captive. While the District argues that it lacked knowledge that its remedial actions were not working (Brief at 46-50), this question was for the jury, which could have found that Anthony endured racial harassment for more than three years, notwithstanding the District's response

to individual incidents. Plaintiff and his mother frequently reported the harassment to Principal Howe and the Superintendent. (JA 427, 431-32, 436-37; JA 991-92, 1083-84, 1086-87; 1095-96, 1111-14 ¶¶ 6, 9, 11,14, 33, 74-79). In addition, through letters from Mrs. Zeno and student disciplinary referrals, the District's own documents show that various administrators knew about the hostile environment, yet offending students remained in plaintiff's classes or stayed on the football team as Anthony's teammate. (JA 438-39; JA 463-65, 489). *Compare, Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 235-36 (D. Conn. 2009) (jury could find that district was deliberately indifferent to sexual harassment where victim and harasser shared same classroom assignment for seven months and no restrictions were placed on the harasser's attendance at school activities).

While the District insists that it responded to all acts of "known" harassment, the hostile environment did not solely consist of acts of violence; plaintiff also testified to rampant hallway harassment and name-calling. In light of this pervasive racial atmosphere, the jury was able to find that the District's failure to implement timely and comprehensive remedial programs was clearly unreasonable. While the District has argued that it was not apprised of each act of hallway harassment, its duty to take effective steps to clean up the educational environment was triggered once it learned that Anthony was enduring a generally hostile

environment. The plaintiff cannot be expected to complain each time he is subjected

to racism at school. In *Crandell v. New York College of Osteopathic Med.,* 87 F.

Supp. 2d 304, 320 (S.D.N.Y. 2000), Judge Kaplan outlined the proper approach:

> Clearly, the institution must have actual knowledge of at least
> some incidents of harassment in order for liability to attach, as
> this is the thrust of *Gebser.* It is equally evident, however, that
> actual knowledge of every incident could not possibly be
> required, as this would burden the plaintiff unfairly in cases of
> frequent harassment to report many separate incidents to the
> appropriate authorities and would oblige the court to determine
> whether each incident alleged was reported and therefore is
> actionable. Suffice it to say, in light of *Gebser,* that the
> institution at minimum must have possessed enough knowledge
> of the harassment that it reasonably could have responded with
> remedial measures to address the kind of harassment upon which
> plaintiff's legal claim is based. This minimum standard is
> appropriate because it adopts *Gebser*'s focus on institutional
> culpability while not putting an unrealistically heavy burden on
> Title IX plaintiffs.

*Id.* at 320. *See also, Folkes v. New York College of Osteopathic Medicine,* 214 F.

Supp. 2d 273, 284 (E.D.N.Y. 2002) ("'actual knowledge of discrimination in the

recipient's programs,' the requirement set forth in *Gebser,* is simply not the same

thing as knowledge of each and every specific discriminatory act"); *id.* at 285

(collecting cases).[5]

Relatedly, while the District suggests that not all adverse incidents were

---

[5] Judge Davison's jury instructions (to which defendant did not object)
reflects this interpretation of the "notice" standard. (JA 1065).

racially-motivated (*see, e.g.*, Brief at 19), the jury could have found otherwise, especially since evidence of the high school's overall racial environment was overwhelming. Racial epithets are not necessary to prove the incidents were racially-motivated, and courts have held that defendants cannot disaggregate the harassment this way. *See, Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010) ("in the context of a claim of sexual harassment, where state of mind and intent are at issue, 'the court should not view the record in piecemeal fashion'"); *Pucino v. Verizon*, 618 F.3d 112, 118 (2d Cir. 2010) ("a plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based"); *O'Rourke v. City of Providence,* 235 F.3d 713, 730 (1st Cir. 2001) ("Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment"); *Brown v. New York State DOCS*, 583 F. Supp. 2d 404, 418 (W.D.N.Y. 2008) ("not every act of harassment need be overtly motivated by the plaintiff's race (or other protected characteristic) to support a claim of hostile work environment").

In sum, reviewing the evidence in the light most favorable to plaintiff, and disregarding the evidence it was not required to credit, *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151 (2000), the jury had various means to find deliberate indifference. As defendant's arguments would disregard the jury's role in assessing

66

the evidence, it is not entitled to judgment as a matter of law. The verdict should be affirmed.

**POINT II**

**THE DAMAGES AWARD DOES NOT SHOCK THE CONSCIENCE**

### A. Standard of review

"'[C]alculation of damages is the province of the jury.' '[T]he standard of appellate review of damage awards, whether compensatory or punitive, is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995). "When reviewing a claim of excessive damages, an appellate court must accord substantial deference to the jury's determination of factual issues." *Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982). This is a "narrow" review. *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003).

As defendant challenges the district court's remittitur calculation, that order is reviewed for an abuse of discretion. *Rangolan v. County of Nassau*, 370 F.3d 239, 245 (2d Cir. 2004). "[O]ne 'objective [of a conditional remittitur] is to minimize the extent of judicial interference with a matter that is otherwise within the jury's domain.'" *Id.* at 244. "Where, as here, the District Court has 'use[d] the least intrusive standard for calculating a remittitur' – namely, 'remit[ting] the jury's award

67

only to the maximum amount that would be upheld by the district court as not excessive – our review on appeal is especially deferential." *Martinez v. The Port Authority*, 445 F.3d 158, 160 (2d Cir. 2006). As Judge Davison used the least intrusive standard in calculating the remittur (SPA 6), deferential review is appropriate.

## B. The damages award does not "shock the conscience"

Bearing in mind that "measuring pain and suffering in dollars is inescapably subjective," the jury heard evidence from every angle. *Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir. 1979). Although the District was deliberately indifferent to 3.5 years of continuous harassment, defendant minimizes plaintiff's pain and suffering, bean-counting the number of pages in the trial transcript in which he presented damages evidence. This is no way to assess a damages award.

"[C]ourts ... have recognized the severe mental trauma associated with unlawful discrimination and have upheld large compensatory awards for the victims in such cases." *Broome v. Biondi*, 17 F. Supp. 2d 211, 224 (E.D.N.Y. 1997). Research "connects the experience of discrimination to lower levels of life satisfaction and higher levels of stress and psychological suffering, including depression. ... Two authors, in particular, described the lasting impact of discrimination: '[i]n the immediate situation or over the long haul, discrimination can

generate determination, embarrassment, frustration, bitterness, anger, rage, and any combination of these feelings. Discrimination is an energy-consuming, life-consuming experience.'" *Id.* at 225, n.9 (citations omitted).

Anthony suffered significant distress and substantially adverse educational consequences as a result of the District's deliberate indifference. Sustained pain and suffering is inherent in the pervasive verbal and physical harassment, including Anthony's knowledge that the school did not properly protect him. Medical testimony was not required. *See, Broome*, 17 F. Supp. 2d at 224 ("proof of mental anguish or emotional distress does not have to include medical testimony and it may consist of the plaintiff's testimony, alone, as corroborated by reference to the circumstances of the alleged misconduct") (citing *Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir. 1993) ("[A] prescription for medicine or a visit to a doctor can lend support to a claim for emotional distress; however, such evidence is neither required nor necessarily probative")).

Anthony testified extensively about his pain and suffering over the course of 3.5 years, enough to bring the case out of the garden-variety category. Anthony testified that the harassment was a shocking introduction to his new high school. (JA 427). He had never experienced this kind of racism on Long Island. Almost as soon as Anthony entered the building, a classmate threatened him: "We don't want your

kind around here." (JA 1162). Apart from the regular racist comments and whispers in the hallway, Anthony was also physically threatened, as one student a few days later tore the chain off his neck (and called it "rapper bling-bling"). While these incidents took place in spring 2005, it was wishful thinking for Anthony to hope that racism might fade away in the fall 2005 semester. Unfortunately, that September, one student punched Anthony in the head in a mad rage. The next day, another student tried to throw a chair at him. In October 2005, bathroom graffiti threatened Anthony's life. That no one was punished for writing the bathroom graffiti only enhanced his anxiety, as Anthony knew the offender was still walking the halls undetected. Anthony was "really upset" when the harassment continued in fall 2005 (JA 431), and Jeff M.'s racist CD in late 2005 "shocked" and "disturbed" Anthony when it was freely passed around school. (JA 438).

By January 2006, a teacher, Pasquarelli, had to calm down plaintiff who "was distressed & upset and talking about his intolerance of racism and his being tired of it etc." (JA 1175; JA 793-94). Pasquarelli also "physically restrained Anthony trying to verbally talk him down. He was saying 'I'm tired of this – I can't take any more of it, I have to stop this – This has been going on *forever*.'" (JA 1177) (emphasis supplied). Howe agreed that Anthony was reaching a breaking point (JA 795-96), and plaintiff complained to him, "Why is this always happening to me?"

70

(JA 451). Meanwhile, Mrs. Zeno told the Special Education director that Anthony "has had a very difficult time in the last couple of weeks" and "[h]e feels school is a battleground and the atmosphere sends a hate message." (JA 1186). Anthony's IEP also noted that he was going "downhill which is very disturbing to see." (JA 1185). He escaped physical injury when two classmates unscrewed the door from his locker. (JA 1102 ¶ 49). Plaintiff heard other classmates talk openly about lynching him. (JA 1102-03 ¶ 50). As a consequence of Anthony's alienation from racist classmates, he had no choice but to eat lunch by himself in the principal's office, hardly the place for a teenager to socialize and blend in with his classmates. (JA 432, 434-35). For plaintiff, this was a "weird, lonely" experience. (JA 434). The racial harassment did not let up; as late as spring 2008, a few months before Anthony graduated, a student who called him a nigger received a light punishment because the Dean of Students took him at his word that Anthony had actually provoked the racial remark.

Plaintiff's mother testified that, as a high school student on Long Island, Anthony was outgoing and friendly (JA 383), and his grades in middle and high school were good in light of his learning disability. (JA 1202, 1213). However, after Anthony enrolled at Stissing Mountain High School, he became introverted and depressed and had a "complete meltdown," saying "he couldn't take it anymore. That these people calling him nigger, that he couldn't handle them, that ... 'niggers don't

71

belong here in Pine Plains,' and that ... he's tired of being called black all the time." (JA 384). When Elouise Maxey met with Anthony in late 2005, she "saw a very terrified, pathetic and sad young boy." (JA 717-18). As a result of his emotional distress, for the first time in his life (JA 385), plaintiff saw a mental health professional "for a while" (JA 469) and "on and off for a year." (JA 385, 503-04). The second therapist told plaintiff that "I could be a danger to myself." (JA 469).

The harassment caused Anthony's grades to drop sharply. However, Mrs. Zeno's complaint to Stoorvogel about Anthony's academics were brushed off even as the IEP linked the racial discrimination to his poor social adjustment at the high school. (JA 1184). *See also*, JA 193 (Mrs. Zeno wrote to the Superintendent in fall 2006 that Anthony's "academics have suffered" "[d]ue to the intensity of the violence"). In fall 2007, Anthony's IEP stated that "Anthony has been struggling with acceptance in the school environment" and "would benefit from counseling to help him address issues in school." (JA 1238). That year, a classmate threatened to rape Anthony's sister and threatened to kick his "black" ass, prompting Anthony to fight back, one of the rare moments that he lost control at school. (JA 456-57).

As he testified, the constant racial attacks struck at Anthony's identity:

Q: How did you like being referred to as the black kid?

72

A: I didn't like it all because that's not who I am. That's not me.

Q: And who are you? Tell us who you are.

A: I'm Anthony Zeno. I come from a big family. I love football. I did a lot of oriented things, did a lot of things in the church. And I didn't – I never fought, except one time. *And it was just constant. It was just a constant thing. I just felt strange, like I was foreign.*" (JA 459) (emphasis supplied).

The jury appreciated the fundamental harm to plaintiff's core identity caused by this type of pervasive harassment, particularly given its duration and that it occurred precisely when his identity was still taking shape. The jury did not need expert testimony to understand this. Moreover, as a young man with learning disabilities, plaintiff could not be expected to articulate any more than he did the severe psychic injury caused by this harassment and the school's failure to protect him.

In addition, the jury was charged with calculating plaintiff's damages "into the future." The charge read, "if you find as fact that the proofs presented justify the conclusion that plaintiff's emotional stress and its consequences have continued to the present time or can reasonably be expected to continue into the future." (JA 1066). The jury reasonably understood that the pain and suffering did not go away when plaintiff graduated. This kind of mental injury can reasonably be expected to last into the future, as Anthony continues to come to terms with the racial treatment

he suffered in high school, which the District could have prevented. There can be no rational argument that Anthony's pain and suffering does not continue to the present day.

In the end, the Zeno family accepted an inferior IEP diploma rather than subject Anthony to further abuse until he turned 21. The jury could deem this a reasonable choice. Mrs. Zeno explained that Anthony could not attend high school any further, "living in hell." (JA 376). "I couldn't allow Anthony to do another two years in that school and be subjected to that abuse. ... At this point, Anthony was at his lowest. He had no self-esteem, no self-image, no self confidence, because he was being torn apart by these tormentors in attacking his color ... the way he looked." (JA 410).

The jury was entitled to take into account Anthony's inability to earn a traditional high school diploma. As documented in the District's own records, the racial harassment adversely affected plaintiff's grades. The jury could find that the racial harassment sufficiently distressed Anthony that he could not earn enough credits to graduate, and he effectively quit school rather than remain in that environment in order to earn the diploma he undoubtedly needs to succeed as an adult. Such a course of action is inherently humiliating, as Anthony's 3.5 years at the high school were essentially for naught.

There is no dispute that an IEP diploma is not a routine high school diploma. The family was advised that the IEP diploma "is not the same as a Regents diploma" and that Anthony would have to stay in school to "receive your further education." (JA 1197). Stoorvogel testified that an IEP is not comparable to a high school diploma and recipients can only attend certain community colleges if they take pre-college courses. (JA 660). Anthony received the IEP diploma because of his academic difficulties resulting from the abusive educational environment. The jury reasonably found that the IEP diploma added insult to injury and further confirmed the pain and suffering of an 18 year-old whose high school years were ruined by the District's deliberate indifference to racial harassment. Putting aside the stigma associated with "graduating" high school without a legitimate diploma, Anthony starts off his adult life with a gaping deficiency which limits his options in higher education or employment. In fixing the damages award, the jury reasonably took into account the humiliation associated with an unwarranted IEP diploma.

While defendant urges this Court to apply the damages standard set forth in employment discrimination cases, Title VI remedies a different harm. Courts recognize that racial harassment suffered by a high school student is quite serious and cannot reasonably be compared to workplace harassment. Quoting from Department of Education regulations, the Ninth Circuit stated:

It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.

This is especially so when we also consider, in accordance with the agency's interpretation, the victim's age. Ninth grade is a sensitive time in a child's life. It is the beginning of high school, when a young adolescent is highly impressionable and is making decisions about education that will affect the course of her life. It is when college plans are often either begun or abandoned. As the *Investigative Guidance* notes, "verbal harassment of a young child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would on an adult."

*Monteiro v. Tempe Union School Dist.*,158 F.3d 1022, 1034 (9th Cir. 1998) (quoting 59 Fed. Reg. 11449 (1994)). *See also, Bryant v. Indep. School Dist.*, 334 F.3d 928, 932 (10th Cir. 2003) (same).

Anthony's high school years were ruined. The high school experience is a finite and formative period in the life of a teenager. He cannot get those years back. Unlike the employment discrimination context, where the adult plaintiff may experience workplace harassment for a relatively short period of time, Anthony was still a minor, and the 3.5 years of racial harassment permeated every aspect of his high school experience, from the hallways to the classroom to the gym to the BOCES bus.

The cumulative destruction of plaintiff's high school experience and its

76

lasting damage is worth $1 million. Even putting aside future pain and suffering, each year of Anthony's harassment entitled him to $250,000 in damages per year. As Judge Davison noted, $1 million is the "outlying figure" for damages in student harassment cases. (SPA 6) (citing *Howard v. Feliciano*, 583 F. Supp. 2d 252 (D. P.R. 2008). Courts have endorsed the aggregation of damages for pain and suffering. *See*, *New York City Transit Auth. v. SDHR*, 78 N.Y.2d 207, 214 (1991) ("the Administrative Law Judge found that the complainant was entitled to $450,000 in damages for mental anguish and aggravation: $250,000 for the Transit Authority's June-July 1981 discrimination, $50,000 for the July-September 1981 discrimination, $100,000 for January-September 1982 discrimination, and $50,000 for the discriminatory conduct in September 1981").

Under this damages model, the jurors could have rationally asked themselves, "What is a lost year in high school worth?" For a teenager undergoing regular racial harassment, $250,000 per school year does not shock the conscience. This conclusion finds support in employment and housing discrimination cases where the victims recover comparable awards for discrimination that transpires over a shorter period of time. This Court should bear in mind that, "when considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for [plaintiff's] injuries today is higher than what it would have been

ten years ago." *DiSorbo v. Hoy*, 343 F.3d at 185. *Compare, Ramirez v. New York City OTB*, 112 F.3d 38, 41 (2d Cir. 1997) (sustaining $500,000 award for emotional distress – $677,978 in 2010 dollars – where plaintiff was "unable to function" and "never got better" following his termination); *Hughes v. Patrolmen's Benevolent Ass'n.*, 850 F.2d 876 (2d Cir. 1988) (sustaining $275,000 in emotional damages – $526,835 in 2010 dollars – for intentional infliction of emotional distress where plaintiff alleged a "campaign of harassment" in the workplace but he received no mental health treatment and made no claim of ongoing psychological problems); *Osorio v. Source Enterprises*, 2007 WL 683985, at *5 (S.D.N.Y. 2007) (sustaining $4 million for pain and suffering on retaliation claim where "[p]laintiff, having risen from humble beginnings to the position of Editor-in-Chief of this prominent publication, only to be summarily dismissed in retaliation for filing a complaint of gender discrimination, might reasonably have suffered, as she averred, substantial emotional distress and reputational harm – and a jury, having found that such retaliation was intentional, could reasonably have concluded, under any standard, to award substantial damages"); *Singleton v. City of New York*, 496 F. Supp. 2d 390, 394 (S.D.N.Y. 2007) (awarding $300,000 in pain and suffering where hostile work environment "led to the dissolution of [plaintiff's] relationship with Sylvia Powell, the mother of his child, and his consequent separation from both. ... To put it

colloquially, Walker's harassment of Singleton, both on and off the job, created a workplace atmosphere in which Singleton felt pervasive fear. This extraordinary hostility warrants damages somewhat above the New York State 'norms' described above"); *Broome*, 17 F. Supp. 2d at 223-26 (sustaining $114,000 to each family member – $154,579 in 2010 dollars – for single episode of housing discrimination); *Town of Hempstead v. SDHR*, 233 A.D.2d 451, 452, 454 (2d Dept. 1996) (sustaining $500,000 in pain and suffering – $693,534 in 2010 dollars – where plaintiff suffered pervasive sexual harassment over a period of nine months even though she sought no counseling).

*Brady v. Wal-Mart Stores*, 455 F. Supp. 2d 157, *aff'd*, 531 F.3d 127 (2d Cir. 2008), supports plaintiff's damages award. In that disability discrimination case, the plaintiff worked for Wal-Mart during summer 2002. *See*, 455 F. Supp. 2d at 163. Although the plaintiff was particularly vulnerable to pain and suffering because of his disability, *id.* at 197, he had since graduated from college and found a job, and Brady's doctor testified that his damages were not long-lasting as he "'had returned a great deal to the baseline' but was not completely restored to his emotional condition prior to the events evidence at issue." *Id.* at 198. Brady's emotional reaction to the disability discrimination resembles the instant case:

> the defendants' discrimination did in fact cause Brady great suffering. Brady's parents testified that his experiences at Wal-

Mart adversely affected his relationship with the rest of his family. They said he "started getting loud and nasty and cursing at his mother and sister"– behavior that he had not previously exhibited. They also testified that their son lost interest in school, experienced a loss of appetite, cried for no apparent reason, paced in his room unable to sleep at night, and displayed an overall demeanor that steadily worsened over time. They described one particularly harrowing emotional outburst, which Mrs. Brady described as a "total breakdown," that prompted the Bradys to take their son to a hospital emergency room, where he ultimately was referred to a psychiatrist named Krishna Gujavarty. *Id.* at 197-98.

After the jury in *Brady* awarded the plaintiff $2.5 million, the district court reduced that amount to $600,000, relying on comparable verdicts and adjusting them for inflation. *Id.* at 201 *Brady* is an *a fortiori* case. The plaintiff in *Brady* suffered disability discrimination over the course of only a few months. Anthony Zeno suffered pervasive racial harassment for 3.5 years. Like *Brady*, Anthony's personality changed as a result of the discrimination and he exhibited an "emotional outburst" at home. His grades suffered and "displayed an overall demeanor that steadily worsened over time." 455 F. Supp. 2d at 197-98.

# CONCLUSION

This Court should affirm the finding of liability. It should also affirm the

$1 million damages award.

Dated:     April 14, 2011

Respectfully submitted,

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
Counsel for plaintiff

## CERTIFICATE OF COMPLIANCE

I, Stephen Bergstein, counsel for plaintiff-appellee, hereby certify that the within brief complies with FRAP 32(a)(7) in that (1) the brief utilizes non-proportional (mono-faced) typeface with no more than 10.5 characters per inch, and (2) the brief contains 18,883 words.

By order dated February 16, 2011, the Second Circuit granted the undersigned permission to file an oversized brief of up to 19,000 words.

STEPHEN BERGSTEIN